Charlene K. Quade (ISB No. 6921)
Sean R. Beck (ISB No. 7992)
C.K. Quade Law, PLLC
600 E. Riverpark Ln., Ste. 215
Boise, Idaho 83706
Telephone: (208) 367-0723
Facsimile: (208) 639-6400
char@charquadelaw.com
sean@charquadelaw.com

and

Shamus P. O'Meara (MN#221454) (*pro hac vice pending*)
Mark R. Azman (MN#237061) (*pro hac vice pending*
O'Meara, Leer, Wagner & Kohl, P.A.
7401 Metro Boulevard, Suite 600
Minneapolis, MN 55439-3034
Telephone: (952) 831-6544
Facsimile: (952) 831-1869
spomeara@olwklaw.com
mrazman@olwklaw.com

**ATTORNEYS FOR PLAINTIFFS**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Erika Dreyer, as parent and natural guardian of B.B.; Jamie Foruria, as personal representative of the Estate of Drew Anthony Rinehart, deceased; Penney Pease, as parent and guardian of Nickolas Pease; William Benjamin, as parent and guardian of Nathan Benjamin; Wendy Mastroeni, as guardian of Michael McNamar; Shelby Bloom and Wendy Gilnet, as parents and next friends of Colby Bloom; and others similarly situated, | Case No. _____ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF** |
| Idaho Department of Health and Welfare, an agency of the State of Idaho; Director, Southwest Idaho Treatment Center, a program of the Idaho Department of Health and Welfare, an agency of the State of Idaho; | |

| | |
|---|---|
| Jamie Newton, individually and as Director of the Southwest Idaho Treatment Center, a program of the Idaho Department of Health and Welfare, an agency of the State of Idaho; the State of Idaho; and John and Jane Does 1-100, | |
| Defendants. | ***DEMAND FOR JURY TRIAL*** |

Plaintiffs Erika Dreyer, as parent and natural guardian of B.B.; Jamie Foruria, as personal representative of the Estate of Drew Anthony Rinehart, deceased; Penney Pease, as parent and guardian of Nickolas Pease; William Benjamin, as parent and guardian of Nathan Benjamin; Wendy Mastroeni, as guardian of Michael McNamar; Shelby Bloom and Wendy Gilnet, as parents and next friends of Colby Bloom; and others similarly situated (collectively Plaintiffs unless otherwise indicated), as and for their Class Action Complaint and Request for Injunctive Relief against the Idaho Department of Health and Welfare, an agency of the State of Idaho; Director, Southwest Idaho Treatment Center, a program of the Idaho Department of Health and Welfare, an agency of the State of Idaho; Jamie Newton, individually and as Director of the Southwest Idaho Treatment Center, a program of the Idaho Department of Health and Welfare, an agency of the State of Idaho; the State of Idaho; and John and Jane Does 1-100, individually (collectively Defendants, states and alleges as follows:

## **INTRODUCTION**

1.     This case arises from widespread abuse, neglect and mistreatment inflicted on current and former residents[1], including Plaintiffs and others similarly situated, of the Southwest Idaho Treatment Center (SWITC), a program operated by the Idaho Department of Health and

---

[1] The term "resident" means an individual residing in an intermediate care facility for individuals with developmental disabilities who requires active treatment services. The term is synonymous with the terms individual and client. *See* IDAPA 16.03.11.010.07.

Welfare (DHW), by SWITC staff and condoned by SWITC administrators and DHW.  The harm

was so rampant, and the injuries so appalling, that DisAbility Rights Idaho (DRI), the state's

designated Protection and Advocacy System[2], conducted an investigation.   DRI's conclusions[3]

were shocking:

| | |
|---|---|
| **OCTOBER 29, 2018**<br><br>**DRI'S REPORT,** *NO SAFE PLACE TO CALL HOME, A Report on the Cycle of Abuse, Neglect, and Injury at the Southwest Idaho Treatment Center* | FINDINGS OF ABUSE AND NEGLECT<br>*"Since January 1, 2017, almost half of SWITC's residents were abused or neglected. Residents were slapped, head - butted, thrown to the ground, and threatened with acts of physical violence if they did not comply with staff's orders.  They were exposed to inappropriate sexual comments by staff, such as making sexual comments about a resident's mother or licking an animal's butthole. They were called derogatory names like "weirdo," "dummy," or "burping, unhygienic, disgusting sacks of shit." Others were ignored as they called for help after collapsing to the floor, or were allowed to harm themselves by repeatedly hitting their head on a hard surface in front of staff who watched and chose not to intervene. A few residents were even denied the assistance they needed for essential skills such as toileting – having been left to sit, eat, and sleep in soiled clothing that were covered in feces."*<br><br>*"Worst of all, a resident died.  The Canyon County Coroner's office reported that on August 20, 2017, a SWITC resident died after having his body in a position that prevented him from breathing.  Although SWTIC staff documented that a staff member checked on him every thirty (30) minutes on the night of his death, video surveillance uncovered that not one SWITC staff person checked on him for almost six (6)hours. Further, SWITC staff documented that he had received medication at 8:00AM that morning, which video surveillance did not support. Again, not one SWITC staff person physically entered the resident's room until 11:29 AM, thus making it impossible to assert he had received his medications at 8:00 AM."*<br><br>SWITC AND DEPARTMENT OF HEALTH AND WELFARE ARE RESPONSIBLE<br>*"DRI believes that the responsibility for this situation lies with the SWITC Administration, personnel, and IDHW. Instead of looking inside and accepting  the abusive and neglectful acts of its staff, SWITC and IDHW chose to blame the residents. They chose to blame the very people who they are responsible under law to care for. They chose to blame Idaho's most vulnerable citizens."*<br><br>*"DRI has found that SWITC has consistently failed to offer the treatment, services, and protections that it is by law obligated to provide to those in its care.  SWITC failed to implement proven evidence-based treatments and practices to reduce altercations and injuries. SWITC ignored or, in some cases, condoned staff for taking actions that were likely to result in altercations and injuries. SWITC failed to prioritize resident safety.* |

---

2   *See* 42 U.S.C. § 15041, *et. seq.*
3   DRI's Report is attached hereto and incorporated herein as Exhibit A.

| | *SWITC failed to properly train its staff to protect those in its care. SWITC failed to employ sufficient numbers of people to complete its mission.* |
|---|---|

2.      Alarmed by SWITC's abuse and neglect, and the suspension of its licensure, on March 12, 2018, three state legislators requested the Idaho Office of Performance Evaluations (OPE) conduct an investigation to understand, among other items, SWITC's "serious problems and compliance failures, as well as whether improved management, staffing, and training could resolve these issues."

3.      The OPE's Report[4] confirmed the systemic, program-wide failures at SWITC:

| | |
|---|---|
| **JANUARY 2019**<br><br>**OPE'S REPORT,**<br>*SOUTHWEST IDAHO TREATMENT CENTER* | *"Idaho lacks a coherent vision for services to individuals with intellectual disabilities who are in crisis."*<br><br>*"Management does not have an effective approach to solving problems."*<br><br>*"SWITC exhibits symptoms of organizational trauma."*<br><br>*"Staff trauma and injury is significant."*<br><br>*"Understaffing has continued to get worse" [through the first nine (9) months of 2018].*<br><br>*"The approach to treatment is reactive rather than proactive."*<br><br>*"SWITC has made significant changes in the past two years.  However, much more needs to be done."* |

4.      Upon receipt of the OPE Report, State Representative Mat Erpelding, Co-Chair, Idaho Joint Legislative Oversight Committee, commented that:

> "The report was far worse than I ever could have imagined. It is disheartening to know the state-run facility has failed all of Idaho. The legislature and Health and Welfare's inability to create a coherent plan for the transition between a long-term facility to a short-term treatment center has left a devastating toll on its staff and clients." https://erpforidaho.com/the-southwest-idaho-treatment-center-switc/

5.      Other members of the state legislature agreed, as did the Director of the Idaho

---

[4]      The OPE's Report is attached hereto as Exhibit B.

Department of Health and Welfare, and Governor Little, when they admitted the failures of SWITC:

| | |
|---|---|
| **GOVERNOR LITTLE LETTER TO OPE, JANUARY 14, 2019** | *"The [OPE Report] points out that Idaho lacks a coherent vision for services to individuals with intellectual disabilities who are in crisis."* |
| **DIRECTOR JEPPESEN JANUARY 17, 2019 JLOC MINUTES** | *"The [Department of Health and Welfare] needed to hold itself accountable. The end goal was to have a treatment model that helped these vulnerable adults be successful. To do that, accountability needed to be in place.* |
| **SENATOR JOHNSON JANUARY 17, 2019 JLOC MINUTES** | *"Senator Johnson said that OPE had made a good point. The Legislature needed to be accountable for crisis care in Idaho."* |

6.     The behaviors resulting in the infliction of abuse, neglect and mistreatment by SWITC and its employees and administrators on Plaintiffs were for behaviors that were manifestations of their disabilities.

7.     Resulting from the failure to properly train employees, the failure to properly assess Plaintiffs and develop appropriate treatment plans, and to identify, report and investigate incidents of abuse and neglect, Defendants failed to use appropriate means of behavior management as options of least restrictions, including implementation of active treatment services.

8.     Through threats of retaliation, intimidation, coercion, physical and emotional abuse, neglect, and fraudulent conduct, Defendants forced Plaintiffs to endure abuse, neglect and mistreatment, and upon information and belief, asserted similar influences over others similarly situated.

9.     Defendants' conduct went far beyond any practices permitted by governing law, substantially departed from acceptable professional judgment, practices and standards of care, and plainly violated principles of common decency, dignity, morality and basic human rights.

10.     Defendants' unprivileged conduct violated the rights of Plaintiffs and others afforded under the Constitution of the United States, the Constitution of the State of Idaho and other applicable federal and state law. Defendants acted in clear violation of well-settled law of which reasonable persons would have been aware.

11.     By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

12.     Plaintiffs seek damages and injunctive relief, including attorney's fees, resulting from Defendants' unlawful, inhumane, cruel and indefensible treatment of Plaintiffs and others similarly situated.

13.     This Complaint provides notice to the United States Department of Justice, Civil Rights Division, of a pattern or practice of violations of the federal rights of Plaintiffs and other residents of SWITC.  Plaintiffs demand an investigation by the United States Attorney General pursuant to his authority under the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997a *et seq.*

## **PARTIES**

14.     B.B. is a minor and a resident of the state of Idaho.

15.     Erika Dreyer is the parent and natural guardian of B.B., and a resident of the State of Washington.

16.     Drew Rinehart, deceased, was a resident of the State of Idaho at the time of his death.

17.     Jamie Foruria is the sister of Drew Rinehart, and the personal representative of

Estate of Drew Rinehart, deceased.

18.     Nickolas Pease is a resident of the state of Idaho.

19.     Penney Pease is the parent and guardian of Nickolas Pease, and a resident of the State of Idaho.

20.     Nathan Benjamin is a resident of the State of Idaho.

21.     William Benjamin is the parent and guardian of Nathan Benjamin, and a resident of the State of Idaho.

22.     Michael McNamar is a resident of the State of Idaho.

23.     Wendy Mastroeni is the guardian of Michael McNamar, and a resident of the State of Idaho.

24.     Colby Bloom is a resident of the State of Idaho.

25.     Shelby Bloom and Wendy Gilnet are parents and natural guardians of Colby Bloom, and residents of the State of Idaho.

26.     Defendant Idaho Department of Health and Welfare is an agency of the State of Idaho.

27.     Defendant Director is the administrative director of the Southwest Idaho Treatment Center.

28.     Defendant Jamie Newton is the administrative director of the Southwest Idaho Treatment Center,

29.     Defendant State of Idaho is responsible for all acts and omissions of employees and agents of the Southwest Idaho Treatment Center and the Idaho Department of Health and Welfare.

30.     John and Jane Does 1-100 are unknown perpetrators of abuse, neglect and mistreatment upon the former and current residents of SWITC, and therefore sues them by those

fictitious names.  Plaintiffs will seek leave to amend this Complaint to state their true names and capacities when they have been ascertained.

## JURISDICTION AND VENUE

31.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and related law, and has original jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3). Plaintiffs have commenced this action pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and related federal and state laws to recover damages, including the costs of this suit and reasonable attorneys' fees, sustained by Plaintiffs and the Class Members by reason of Defendants' violations of federal and state law and for injunctive relief as more fully set forth herein.

32.     This Court has supplemental jurisdiction over the claims in this Complaint that arise under state law pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

33.     Venue in the District of Idaho is appropriate pursuant to 28 U.S.C. § 1391, as the conduct alleged herein occurred in this District.

## GENERAL ALLEGATIONS

### Southwest Idaho Treatment Center

34.     SWITC is owned, operated and licensed by the Idaho Department of Health and Welfare (DHW), a department of the State of Idaho.  It is the only state-operated intermediate care facility for individuals with intellectual disabilities (ICF/DD) in Idaho.

35.     Originally known as the Idaho State Sanitarium, SWITC has undergone several name changes in its 100 year history.  It is located in Nampa, Idaho, on a 600 acre campus owned

by the State.

36.     According the DHW, SWITC's mission "is to provide services as a short-term therapeutic stabilization and transition center for clients" "with intricate and challenging needs, with the goal of transitioning them to effective community placements for long-term services as quickly as possible."  SWITC seeks to "support . . . individuals in crisis to become stable, develop skills, and successfully transition to the community."

37.     SWITC is designed to be a home of "last resort," and its policies permit admission only after all other options have been exhausted.

38.     Residents of SWITC are some of our most vulnerable citizens.  Each resident is a person with an intellectual disability, but many have additional highly complex needs based on physical impairments and mental illness, and some have limited or no communication skills.

39.     Both state and federal rules apply to the operation of SWITC.  *See generally* IDAPA 16.03.11.000 *et. seq.*; 42 C.F.R. §483.400 *et.seq.*

40.     Section 483.420(a), (d) provides in relevant part:

> (a) Standard: Protection of clients' rights.  The facility must ensure the rights of all clients.  Therefore, the facility must –
> *       *       *
> (5) Ensure that clients are not subjected to physical, verbal, sexual or psychological abuse or punishment;
> (6) Ensure that clients are free from unnecessary drugs and physical restraints and are provided active treatment to reduce dependency on drugs and physical restraints;
>
> (d) Standard: Staff treatment of clients.
> (1) The facility must develop and implement written policies and procedures that prohibit mistreatment, neglect or abuse of the client.
> (i) Staff of the facility must not use physical, verbal, sexual or psychological abuse or punishment.
> (ii) Staff must not punish a client by withholding food or hydration that contributes to a nutritionally adequate diet.

(iii) The facility must prohibit the employment of individuals with a conviction or prior employment history of child or client abuse, neglect or mistreatment.

(2) The facility must ensure that all allegations of mistreatment, neglect or abuse, as well as injuries of unknown source, are reported immediately to the administrator or to other officials in accordance with State law through established procedures.

(3) The facility must have evidence that all alleged violations are thoroughly investigated and must prevent further potential abuse while the investigation is in progress.

(4) The results of all investigations must be reported to the administrator or designated representative or to other officials in accordance with State law within five working days of the incident and, if the alleged violation is verified, appropriate corrective action must be taken.

41.    Section 483.430 imposes obligations upon SWITC to ensure that SWITC's clients' active treatment program are integrated, coordinated and monitored by qualified professionals, that SWITC utilizes responsible direct care staff that are able to take prompt and appropriate action at all times, that sufficient direct care staff are on duty consistent with required staff-to-client ratios, and that staff receive appropriate and continuing training that allows each staff person to perform their duties effectively, efficiently and competently.

42.    Section 483.440 obligates SWITC to ensure that each resident receives a continuous active treatment program, "which includes aggressive, consistent implementation of a program specialized and generic training, treatment, health services and related services" directed to allow the resident to function with as much self-determination and independence as possible and "the prevention or deceleration of regression or loss of current optimal functional status."

43.    Federal law further provides, at 42 C.F.R. § 483.450(a)-(b):

(a) Standard: Facility practices—Conduct toward clients.

(1) The facility must develop and implement written policies and procedures for the management of conduct between staff and clients. These policies and procedures must—
(i) Promote the growth, development and independence of the client;
(ii) Address the extent to which client choice will be accommodated in daily

decision-making, emphasizing self-determination and self-management, to the extent possible;

(iii) Specify client conduct to be allowed or not allowed; and

(iv) Be available to all staff, clients, parents of minor children, and legal guardians.

(2) To the extent possible, clients must participate in the formulation of these policies and procedures.

(3) Clients must not discipline other clients, except as part of an organized system of self-government, as set forth in facility policy.

(b) Standard: Management of inappropriate client behavior.

(1) The facility must develop and implement written policies and procedures that govern the management of inappropriate client behavior. These policies and procedures must be consistent with the provisions of paragraph (a) of this section. These procedures must—

(i) Specify all facility approved interventions to manage inappropriate client behavior;

(ii) Designate these interventions on a hierarchy to be implemented, ranging from most positive or least intrusive, to least positive or most intrusive;

(iii) Insure, prior to the use of more restrictive techniques, that the client's record documents that programs incorporating the use of less intrusive or more positive techniques have been tried systematically and demonstrated to be ineffective; and

(iv) Address the following:

(A) The use of time-out rooms.

(B) The use of physical restraints.

(C) The use of drugs to manage inappropriate behavior.

(D) The application of painful or noxious stimuli.

(E) The staff members who may authorize the use of specified interventions.

(F) A mechanism for monitoring and controlling the use of such interventions.

(2) Interventions to manage inappropriate client behavior must be employed with sufficient safeguards and supervision to ensure that the safety, welfare and civil and human rights of clients are adequately protected.

(3) Techniques to manage inappropriate client behavior must never be used for disciplinary purposes, for the convenience of staff or as a substitute for an active treatment program.

(4) The use of systematic interventions to manage inappropriate client behavior must be incorporated into the client's individual program plan, in accordance with § 483.440(c) (4) and (5) of this subpart.

(5) Standing or as needed programs to control inappropriate behavior are not permitted.

44.    Idaho administrative rules provide that, as an ICF/DD, SWITC is "an institution

that meets federal conditions of participation and has as its primary purpose the provision of health or rehabilitation services to individuals with intellectual disabilities or related conditions receiving care and services under the Medicaid program, which is organized and operated to provide services to four (4) or more individuals, not related to the owner."  IDAPA §16.03.11.010(17).

45.     Idaho law prohibits the "application of painful or noxious stimuli and the use of enclosures."  IDAPA §16.03.11.501.

## Substantiated Abuse, Neglect and Mistreatment at SWITC

46.     In June 2017, DRI was alerted to a "large scale internal investigation [] being conducted at SWITC by SWITC / DHW investigators regarding numerous allegations of abuse and neglect involving multiple staff and residents, including incidents of staff targeting certain residents and engaging in acts of physical abuse, psychological / verbal abuse, and neglect."  DRI Report, at p. 14-15.  Over 70 investigations of resident abuse and neglect were conducted with 49 acts of abuse and neglect by staff substantiated between January 1, 2017 and January 31, 2018.  *Id.*

47.     DRI's review of the SWITC/DHW investigations revealed:

- In 25 investigations, numerous acts of abuse and neglect were substantiated:
  - 5 acts were inappropriate sexually oriented communications.
  - 7 confirmed acts of physical abuse.
  - 11 confirmed acts of psychological abuse.
  - 26 confirmed acts of neglect.
- 14 residents were abused or neglected by 23 staff persons.
- 6 residents were abused multiple times.
- 5 staff persons committed multiple acts of abuse and/or neglect.

48.     SWITC's internal investigation also found that one staff person engaged in kick-boxing:

On June 10, 2017, you [staff person] appeared to engage in kickboxing horseplay with client NB.  NB subsequently repeated what he learned with another client, MM, knocking MM to the ground. The video footage shows MM getting up, gripping his elbow in obvious pain. You [staff person] were present for this entire event. Yet you [staff person] failed to intervene regarding the kickboxing between the two clients, and also failed to offer

assistance to the client in distress.

49.     Based on reports of abuse or neglect, the Adult Protection Program of the Idaho Commission on Aging also conducted an investigation and substantiated 11 acts of abuse of a vulnerable adult, and 8 acts of neglect of a vulnerable adult.

### Licensing Deficiencies

50.     The Idaho Bureau of Facility Standards (BFS) is responsible for licensing and certifications to ensure that SWITC is in compliance with federal Medicaid requirements.  BFS is a bureau within the DHW, and has licensed SWITC as Provider #13G001.

51.     During four surveys conducted in 2017 and 2018, the BFS determined that SWITC did not have policies and procedures to prevent abuse and neglect, and that policies that SWITC did have were not sufficiently implemented to protect residents' rights.

52.     BFS further found that SWITC failed to provide guardians with information sufficient to make informed decisions, implemented strategies without guardian consent, administered unnecessary medication and failed to take appropriate corrective action in response to reports of abuse and neglect.

53.     During one survey BFS observed a resident repeatedly physically assault another resident for nearly 2½ hours while *multiple* staff observed but took no action to intervene and protect the residents.

54.     BFS investigations found that SWITC conduct had permitted residents to be placed in immediate jeopardy of harm, and resident care plans were insufficient to ensure resident safety. These incidents were *in addition* to the 49 confirmed incidents of abuse and neglect internally investigated by SWITC, indicating that SWITC failed to identify, report, investigate or correct them.

55.     BFS further observed the improper use of restraints by two staff persons on a resident in direct contravention of the resident's care plan, and risking trauma and injury, and possibly paralysis, due to the resident's existing physical conditions.

56.     Overall, DRI's investigation detected a disturbing trend at SWITC:

> During the [BFS] investigation period, DRI observed that SWITC continuously violated its own policies, state law, and federal law. What is most troubling is that each time SWITC was confronted with its own failures, its Administration provided written assurances that things had changed. That failures or deficiencies had been corrected. Yet time and time again, those failures continued to appear. **As a result, DRI is left to conclude that issues at SWITC have not been corrected and that SWITC is not safe place to call home.** DRI Report, at p. 32 (emphasis added).

### SWITC'S Deficient Policies

57.     DRI's Report uncovered not only program-wide, repeated episodes of abuse and neglect, but also a wholesale of lack of sufficient policies:

> Unfortunately, concerns regarding the safety of SWITC residents do not end with the substantiated instances of abuse and neglect documented above. This report describes a series of inadequacies that exist at SWITC, which continue to place residents in harm's way. **Such inadequacies have permeated through every level of facility operation from facility policies, to staff training and supervision and incident response. When combined, they have created a cycle of abuse, neglect, and injury that continues to this day.** DRI Report, at p. 32-33 (emphasis added).

58.     SWITC's Policy 01.11.0, governing investigation of abuse, neglect and mistreatment does not invoke a zero-tolerance approach, fails to state that termination may result from improper conduct, and only protects residents from willful acts (which itself is a violation of state law). Such a policy promotes a culture where staff can hit or bruise residents, as long as they do not intend to harm a resident. Policy 01.11.0 was amended recently, but instead of broadening resident protections, it narrowed them by restricting the definition of sexual abuse.

59.     SWITC's policies also fail to provide any specific guidance on the principles of "active treatment" that are crucial, and mandated by law, in order to provide specialized training,

treatment and health services to residents to allow them to maximize their independence and preserve their existing skills functions.  "Active Treatment" is defined as:

> Aggressive, consistent implementation of a program of specialized and generic training, treatment, health, and related services directed toward the acquisition of skills necessary for the individual to function with as much self-determination and independence as possible. It includes the prevention or deceleration of regression or loss of current optimal functional status.  IDAPA §16.03.11.010.

60.     DRI summarized SWITC's unacceptable policy failures aptly:

> SWITC's policies are the primary source of communicating its philosophical approach to resident care, treatment, and safety. As such, they unfortunately serve as the beginning of SWITC's perpetual cycle of abuse and neglect. Not only do SWITC's policies fail to send the message that its residents come first, they actually convey the opposite. If a facility does not take the time to incorporate resident-centered values and principles within its written policies, practices, and procedures, proper needs assessments may not be timely completed. Comprehensive treatment programs and plans may not be developed. Staff training and supervision requirements may go undefined. Worst of all, staff will operate without the expectation that resident abuse or neglect will not be tolerated. Hence, a cycle of inadequacies is born, negatively affecting the care, treatment, and safety of those the facility is required to serve and protect.  DRI Report, at p. 46.

### SWITC Failed To Provide Mandated Care And Services

61.     By federal law, SWITC is required to provide "active services treatment," which is a:

> program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services, and related services….directed toward…[t]he acquisition of behaviors necessary for the individual to function with as much self-determination and independence as possible…"  42 C.F.R.§483.440(a); IDAPA 16.03.11.400.

62.     During surveys, BFS observed multiples instances where SWITC failed to provide active treatment to residents, including by a failure to have updated assessments (some years out of date) with current information which impeded appropriate programming, failed to provide professional services called for in assessments, and plans that were substantially incomplete, or where SWITC simply did not bother to implement them.

63.     DRI found that SWITC claimed deficiencies were corrected, but SWITC "continued to be cited for deficiencies surrounding its provision of active treatment services in [BFS] surveys conducted in October of 2017 and February of 2018."

> Without the provision of a "continuous and active treatment program," residents at SWITC may never have the opportunity to acquire the skills necessary to function with as much self-determination and independence as possible, thereby creating the second step in SWITC's cycle of abuse and neglect. According to Administrator Jamie Newton, "most" of SWITC's residents "have serious behavioral histories," and reside at SWITC "because they are dangerous to others or themselves."  If such statements are indeed true, then it is even more imperative that SWITC fulfill its obligation to provide active treatment services starting with complete, comprehensive assessments and evaluations which identify each resident's specific needs so that appropriate and effective treatment plans can be created to address them. Rather than continuing to blame residents for their behaviors, SWITC and IDHW should instead examine their own failures to meet their constitutional, federal, and state responsibilities. Without current, appropriate assessments to identify each resident's need, addressed through a comprehensive, individualized, and implemented plan that meets the residents' needs, those "serious" and "dangerous" behaviors will continue to go untreated, possibly increasing and worsening as time goes on. As a result, residents will not achieve the skills they need to manage such behaviors so they can someday live independently and staff will not have the tools or strategies they need to address such behaviors appropriately. Combine this with the fact that the facility repeatedly leaves shifts shortstaffed, employing staff who are poorly trained and unsupervised, it is not difficult to imagine how situations of resident abuse and neglect can arise.  DRI Report, at p. 51-52.

## **Staffing Deficiencies**

64.     SWITC allowed significant staffing deficiencies to accrue, to the detriment of residents.

65.     SWITC failed to employ the minimum amount of staff necessary to comply with state and federal law in 2017 and persisting into 2018 for a total of over a year.  During this time, SWITC continued to admit new residents, and continued to bill Medicaid for providing services to residents – "services that it was not capable of adequately providing without having the minimum number of required staff."  DRI Report, at p. 53.

66.     Inadequate staffing causes increased risk to residents and staff, including abuse and neglect, lack of supervision, uncontrolled environments, inactivity, and a failure to implement

programs and plans.

67.     Assurances from SWITC administration that staffing deficiencies were corrected, but ongoing verbal, physical and psychological abuse continued.  DRI's report found:

> Residents also harmed themselves, hitting their heads repeatedly against hard surfaces or hitting objects such as walls or windows with their hands. Moreover, individuals residing at SWITC were also subjected to staggering numbers of abuse and neglect from facility staff. When not subjected to harm from themselves or others, residents are left to essentially entertain themselves, sitting for hours watching television, sleeping, or spending time alone in their rooms with little to no interaction or supervision from staff.128 In fact, in four (4) of the internal abuse and neglect investigations DRI reviewed, investigators were told by staff that they were "short [staffed]" or "short of time" and, as a result, could not comply with resident supervision requirements or implement treatment plans correctly.  DRI Report, at p. 55.

68.     SWITC's failures went further, and included repeated and ongoing failures to properly train and supervise staff, including instances of no training at all, or inadequate training. These deficiencies led to at least 21 investigations where abuse and neglect was either not reported or not timely reported.

### Investigation Failures

69.     Despite obligated to do so by law, SWITC on multiple occasions failed to conduct thorough investigations of abuse and neglect, including failing to interview witnesses and failing to resolve discrepancies in witness accounts.

70.     DRI reported that SWITC failed to identify, report or investigate over 40 incidents where staff placed residents at risk of injury or death, over and above the 49 allegations of abuse and neglect otherwise substantiated.

71.     Further, during investigations, SWITC and DHW investigators allowed SWITC staff to create missing or incomplete incident reporting forms after the fact, and then rely on the information in those forms to conclude that abuse or neglect had not occurred.  SWITC's Administrator failed to recognize or correct these improper actions.

72.     SWITC also imposed a preposterous practice of having residents sign confidentiality forms, which operated to hide abuse and neglect by purporting to prohibit residents form speaking about abuse or neglect allegations to anyone, even their families:

> Such secretive overtones were further ingrained through comments investigators made while explaining the form during resident interviews. The investigator would inform the resident that "the investigations are confidential and that [the resident] cannot talk to anyone about it." In one particular case, the investigator asked two (2) residents if they "remembered the rule of investigations?" One resident confirmed that he did, stating "[y]ou don't talk to anyone." **The other resident said "yes" and that "you can't tell anyone, even in your family."** In another case, the investigator explained to the resident that keeping things confidential "means don't tell anybody." The investigator then asked, "Can you keep a secret?" **At no time did the investigators advise the residents of their statutory right to communicate with anyone they choose, nor did investigators advise residents that they were free to discuss such matters with other investigative agencies such as the police, Adult Protection, Bureau of Facility Standards surveyors, or even the DRI. In fact, when one resident informed an investigator that a DRI employee was assisting them, the investigator reminded the resident "what this form says is that you and I will keep our conversation between us."** DRI Report, at p. 75.

73.     When residents would refuse to sign the confidentiality forms, SWITC investigators signed for them, sometimes indicating on the form "with his permission."

74.     Further, the corrective actions recommended by SWITC's administrator failed to ensure the safety of residents or recognize the importance of resident safety. The Administrator's corrective actions were inconsistent, incompletely implemented, or simply insufficient. These deficiencies failed to impart accountability and contributed to SWITC's endless loop of abuse and neglect.

### Office of Performance Evaluations

75.     In response to media revelations of abuse and neglect at SWITC, and BFS' suspension of SWITC's licensing due to deficiencies in governance and management, client protections, facility staffing, active treatment services, and client behavior-related practices, as well as ongoing and persistent complaints about SWITC, on March 12, 2018, several Idaho

legislators requested the OPE conduct an investigation of SWITC's operational structure, which was approved by the Idaho Joint Legislative Oversight Committee.

76.     OPE issued its final report in January 2019 (attached hereto and made a part hereof as Exhibit B).

77.     OPE's investigation revealed that SWITC administration, staff and operational structure lacked proper vision, sufficient oversight, and accountability:

> **Idaho lacks a coherent vision for services to individuals with intellectual disabilities who are in crisis.** Efforts in recent years have focused on keeping individuals in the community and out of institutions. These efforts have transformed the role of the state as the provider of last resort without a clear focus on the individuals whose needs meet the level of care at SWITC. Every client at SWITC has complex behavioral or medical needs, and many have co-occurring mental illnesses and a history of assault or self-harm.

> **Management does not have an effective approach to solving problems.** SWITC's constant focus on putting out fires has undermined its ability to make progress on long-term objectives. Management's decisions lack buy in from staff, and changes are made without effective follow-through and monitoring.

> **SWITC exhibits symptoms of organizational trauma.** Attitudes and practices developed for survival in times of crisis have become normalized and are passed on to new staff. Many in leadership and clinical positions came during crisis, did not have effective training, and have struggled to understand their role.

> **Staff trauma and injury is significant.** For the first half of 2018, one in ten staff days was spent out on injury; on one shift that number was one in five. Injuries also lead to medical layoffs or staff quitting for fear of further injury. Staff are frequently assaulted, sustaining both severe and chronic injuries. While physical injuries are addressed, psychological trauma remains, and staff lack adequate tools for self-care. These unaddressed needs lead to dysfunctional relationships with clients.

> **Understaffing has continued to get worse.** For six of the first nine months in 2018, SWITC lost more staff than it hired. Understaffing threatens client and staff safety, in turn worsening turnover and putting clients at risk of abuse and neglect.

> **The approach to treatment is reactive rather than proactive.** Exacerbated by understaffing and a crisis mentality, direct care staff are often described as babysitters waiting for the next behavioral crisis. As new staff are hired into an environment where being reactive is the norm, efforts to encourage proactive solutions get more difficult.

> **SWITC has made significant changes in the past two years. However, much more**

**needs to be done.** Staff care deeply for clients and the organization. They have great energy and ideas. After the traumatic events of 2017, SWITC made changes to address gaps in management, staffing, and training. SWITC hired a program manager from out-of-state, implemented a two-week staff training program, and significantly increased pay for new hires and existing staff. Other efforts include improved relationships with adult protective services and trainings for investigative staff.

OPE Report, at pp. 5-6.

78.     In order to address the "system-wide issues and issues with SWITC's operations

and treatment standards, OPE presented two core recommendations:

**We recommend that the Department of Health and Welfare develop a strategic plan and a formal quality improvement process at SWITC.** This process should be done in a way to ingrain staff buy in, accountability, and formal evaluation of efforts into SWITC's organizational culture. Priorities for program improvement include addressing staff trauma and injury, understaffing, gaps in training and supervision, a reactive approach to treatment, and problems with the discharge process. Improvements in SWITC's leadership and management are necessary. We recommend that the department present the strategic plan and updates on its quality improvement process to the legislative Health and Welfare committees at the start of the 2020 legislative session.

**We recommend the Legislature direct the Department of Health and Welfare** to develop a long-term vision for Idaho's system of crisis care and its role as provider of last resort for those with intellectual disabilities. The Legislature should provide policy guidance for this vision. Stakeholders and other states should be included as appropriate.

OPE Report, at p. 7.

79.     The mixture of SWITC's program-wide, profound and engrained flaws produced a

facility with an unlawfully low flashpoint for abuse, neglect and mistreatment

80.     At all times material, as more fully described herein, Defendants acted under color

of state law to deprive Plaintiffs of the rights, privileges, and/or immunities secured by the

Constitution and laws of the United States.

## **B.B.**

81.     B.B.'s SIB-R, a test primarily designed to measure functional independence and

adaptive functioning in home, school, employment and community settings, indicate that B.B.

functions at an age of approximately one year and three months.

82.     B.B. is completely non-verbal and incontinent.  He has an IQ of 40.

83.     He has been diagnosed with Autism-Severe, Bipolar Disorder, Intermittent Explosive Disorder, Developmental Disabilities-severe, profound intellectual disability, Pica Disorder, and a traumatic brain injury among others.  B.B. operates at the functional age of 15 months.

84.     B.B.'s mother, Erika Dreyer, did all she could to keep B.B. safe at home for as long as she could.

85.     But as B.B. grew and became stronger, his disabilities became harder to accommodate at home and dangerous to others living there.

86.     B.B. was placed at SWITC in 2015 when he was nine years old and kept there for two years.

87.     B.B. has a history of harming himself by hitting his head with his fists, objects, on cement sidewalks, and through walls.  This has led to the development of a two-inch layer of scar tissue on his head as well as a traumatic brain injury.  SWITC employees refused to intervene. Erika requested they provide him a helmet or padding, but SWITC declined.

88.     Due to his inability to communicate and his functional intellectual level, B.B.'s frustrations are expressed physically.  He has a history of violent tendencies including biting, hitting, and pinching.  He also has a history of removing his diaper and smearing or eating his feces.  Upon admission, Erika requested that SWITC use B.B.'s communication device, which was given to SWITC, but SWITC refused.

89.     Further, B.B. has difficulty assessing danger and has attempted to exit moving vehicles.

90.    B.B. requires an assessment and an appropriate active treatment plan to address his conditions.

91.    Due to his disabilities and the manifestations of his disabilities, he was placed in state custody at SWITC on July 14, 2015, at which time SWITC assumed responsibility for his care and treatment.

92.    While there, Erika visited regularly and observed SWITC staff failing to follow his care plan, or use proper re-direction tools.

93.    She observed bruising, lacerations, scar tissue, and cuts on B.B.'s body that were not self-inflicted, and she observed bruising on his legs and arms and bleeding from his head.  On at least one occasion, SWITC lost B.B. for half an hour.

94.    SWITC staff administered large dosages of his medications in amounts exceeding the dosage recommendations, but never notified Erika of the changes to his medications.

95.    B.B. was ultimately placed outside SWITC with a community care provider in July of 2017, subject to an agreement between Erika and SWITC that if the placement did not work our B.B. could return to SWITC.

96.    In August of 2017—only after B.B. had left SWITC—Erika learned that SWITC staff had been overhead on recordings explaining that in order to get B.B. to behave, staff needed to hit him.

97.    At that same time, Erika was told—as she had suspected from his injuries—that B.B. had been emotionally and physically abused by SWITC employees.  Child Protection Services (CPS) should have been notified about the abuse inflicted on B.B., but upon information and belief, CPS was not notified.

98.    Erika was not informed that her son had been abused while B.B. was at SWITC, or

made aware of any investigations from that abuse.

99.     The culture at SWITC created an environment that changed B.B. from a young boy with severe problems who still showed his family affection into a young boy with even worse difficulties who is withdrawn from the world, including his family.

### Drew Rinehart

100.     Drew was a gentle giant with a difficult and troubled childhood.  He never knew his biological father and suffered serious physical abuse from his stepfather during his early years.

101.     Drew's troublesome behavior began around age eight, and he also began showing signs of intellectual disabilities in school at that time.

102.     Drew's stepfather was sent to prison when Drew was 13 and his family lost their home.

103.     In his teens, Drew and his sister Jamie (now the personal representative of Drew's estate) lived with their grandparents who took good care of them, but Drew was bullied in school due to his living situation and cleanliness.

104.     Drew began demonstrating violent tendencies in his teens.  When Drew did not get what he wanted on small issues, such as having a pop, he would throw things and hit walls.

105.     He was also overtly violent with his younger brother, and this ultimately began the cycle for Drew of being placed in assisted living homes once he was 18.

106.     Eventually, Drew was diagnosed with autism, depression, schizophrenia, and PTSD due to his childhood abuse.

107.     Despite his difficulties and disabilities, Drew was loved by his family and had hobbies and interests one would expect.  He loved animals, telling jokes, and performing magic tricks.  He collected rocks and enjoyed swimming, riding bikes, and listening to country music.

108.    Drew took great comfort in his relationships with his sister, Jamie, and his grandparents.  Once Drew was removed from those relationships by the state of Idaho, his behavior and health deteriorated.

109.    Ultimately, Drew became a ward of the state and was involuntarily committed to SWITC.

110.    While there, he was repeatedly punished by SWITC staff when they would take away his personal belongings, prevent him from speaking with his family on the phone, and take away the "privilege" of seeing and having a relationship with his sister, mother, and grandmother.

111.    In perhaps one of the worst cases of neglect, abuse and mistreatment, Drew died at SWITC on August 20, 2017.  He was just 27, and scheduled to be discharged only 8 days later.

112.    Drew died after SWITC left him unattended and unobserved in bed for over 6 hours, despite marking a log sheet showing safety checks on the half hour, and that he had been administered medication at 8:00 a.m., when in fact he had not.  SWITC staff and administration admitted that the log sheets are not accurate and boxes are checked even though actual client checks were not performed.  Staff performed a safety check at 4:17 a.m., and then did not check on him until 10:18 a.m.  Staff did not discover something was wrong until 11:29 a.m., when staff actually went into his room and tried to wake him.

113.    The coroner ruled the cause of Drew's death to be positional asphyxiation, with a time of death between 4:29 a.m. and 5:29 a.m.  He had been found with his hand and feet bound with socks, and blankets and possibly a pillow over his head.

114.    Despite an obligation to check on Drew every 30 minutes his death remained unidentified for many hours.

115.    Shortly before his death, Drew had complained of repeat physical abuse by SWITC

staff.  His complaints included:

      a)      forcefully twisting his arm behind his back and

      b)      slamming him against the wall because Drew had used the telephone.

116.    SWITC also regularly failed to protect Drew from physical abuse by other residents.

### Michael McNamar

117.    Michael McNamar was a resident at SWITC in June, July, and August of 2017.

118.    Michael has been diagnosed with Autism Spectrum Disorder, mild, with delusions and mood symptoms and aggressions.

119.    While at SWITC, Michael was physically and emotionally abused.

120.    Due to his autism, Michael thrives in structured, predictable environments.

121.    He struggles, however, with sensory needs and others touching him.  This is especially true when he is agitated, annoyed, or angered, but SWITC staff repeatedly put hands on Michael during those times, exacerbating his difficulties.

122.    On June 12, 2017, Michael was inappropriately restrained by SWITC staff resulting in injuries to his person.  His guardian was told that Michael "bumped his head during a meltdown."

123.    In fact, Michael complained that he had been abused and a SWITC investigation was initiated.  His guardian was not informed of the investigation.

124.    The investigation found that SWITC had, in fact, abused Michael.

125.    On one occasion, Michael was shoved into his room, pushed into a dresser, and knocked to the floor.  SWITC staff struck him in the left eye and tripped him, causing his head to hit the ground and a loss of consciousness.

126.    Subsequent reports indicate that Michael's head was repeatedly slammed into the ground.

127.    On another occasion, he was physically dragged into his room causing injury to his knee.

128.    By way of letter dated June 23, 2017, his guardian was informed that Michael had reported another incident of abuse and that an investigation would begin that day.

129.    When Michael's guardian contacted various SWITC officials to inquire about the status of the investigation, some were unaware of it and others refused to discuss it.

130.    In July 2017, Michael's guardian visited Michael at SWITC.  His room was filled with garbage, rotting food, moldy drinks, and dirty laundry.

131.    Michael had been in the same clothes for a week without showering, and was covered in food.

132.    Michael reported that, in the mornings, SWITC staff would flip his mattress off the bed to wake him.

133.    The abuse caused Michael to engage in self-injurious behavior, which is not typical for Michael.

134.    His guardian witnessed another resident attack Michael.  Thereafter, the same resident repeatedly attacked Michael, resulting in injuries to his chest, back, and arms.

135.    On July 19, 2017, Michael was taken by SWITC staff to Lake Lowell.  Michael had a hard time while there, and SWITC staff threw him to the ground and dug their knuckles into him.

136.    Michaels' hand was injured and remained inflamed and bruised days later.

137.    Due to the stress from his abuse, Michael began identifying as female.

138.   Ultimately, SWITC discharged Michael in early August despite no suitable placement being found, and placed him far away from his support systems.

**Nickolas Pease**

139.   Nickolas Pease resided at SWITC for 8 months in 2015, for several weeks in 2016, and from April 6, 2017 through March 22, 2019.

140.   Nickolas has been diagnosed with Cornelia de Lange syndrome, a genetic condition affecting 1 in 10,000 persons.  Nickolas is a person with a developmental disability, has limited speech skills, displays self-injurious behaviors, and suffers from a heart murmur.  He operates at functional age of approximately 4 years.

141.   While at SWITC, Nickolas was abused and neglected on repeated occasions, and subjected to mistreatment.  SWITC's conduct caused an increase in the manifestations of behaviors from Nickolas' disabilities.

142.   SWITC staff improperly dispensed steroid medication to Nickolas for over a year, which negatively affected his behaviors.

143.   While at SWITC, Nickolas suffered from bruising, facial cuts, and other physical abuse that was not self-inflicted, including for example, being pushed down by staff.

144.   SWITC staff also subjected Nickolas to physical restraining, including at times so severe that it caused him to vomit.  On another occasion, SWITC staff engaged in a restraint with such force that Nickolas was injured and lost a tooth.

145.   SWITC staff has strangled Nickolas.

146.   On one occasion, while Nickolas was on the phone with his mother Penney Pease, Nickolas was following a staff person, and she heard Nickolas yell in desperation "No, no, no hurt!"

147.    SWITC administration refused to allow communication with Penney after ongoing issues involving abuse and restraints.

148.    Disgusted with the ongoing abuse, neglect and mistreatment of her son, and desperate to relieve her son from SWITC's relentless unlawful conduct, Penney requested his discharge to her home, even though she is not sufficiently equipped to manage his needs for care and treatment.

### Nathan Benjamin

149.    Nathan Benjamin has been a resident of SWITC for approximately 6 years, and is a current resident. SWITC administrators have repeatedly told Nathan's father and guardian that "there is no other place for [Nathan]" other than SWITC.

150.    Nathan is a person with a disability.  He is on the autism spectrum, suffers from a traumatic brain injury, and is fully able to communicate.

151.    Nathan has been subjected to abuse and neglect while a resident of SWITC.  He has been slapped, choked, stood upon, pinned against a wall with elbows at his throat, and had shoes thrown at him, all of which was casually dismissed by SWITC staff and administrators without consequences.

152.    SWITC staff gave martial arts "lessons" to residents, including Nathan, and had them practicing martial arts on each other without care for the safety or well-being of the residents, often without any supervision or interruption by staff, none of which was included as part of an active treatment program of any resident.

### Colby Bloom

153.    Colby Bloom has been a resident of SWITC since approximately 2013 for what was supposed to be only a few weeks.  He remains a resident, and has become effectively

institutionalized.  SWITC staff refused to allow Colby to have contact with his mother, and would impede phone contact with his father.

154.    Colby is a person with a disability, with a functional capacity of a 4-5 year old.

155.    Colby has been subjected to abuse and neglect while a resident of SWITC.  For example, SWITC staff have been observed attacking Colby for over 20 minutes at a time when he was a minor.  This abuse was not reported as abuse to a vulnerable child or, upon information and belief, investigated.  Colby suffered a black eye from this beating, and the staff member that inflicted this abuse was not terminated or disciplined.

156.    The disabilities of Plaintiffs and Class Members toll the accrual of their claims under IHRA, or as otherwise applicable. *See, e.g.,* Idaho. Stat. § 5-230.

## CLASS ACTION ALLEGATIONS

157.    Plaintiffs seek to represent a Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and applicable law.

158.    Plaintiffs bring their actions on their own behalf and on behalf of the following putative Class:

a)    All current and former residents of SWITC subjected to abuse, neglect and mistreatment.  As a practice, and due to the failure to properly train and supervise employees, Defendants failed to employ and implement active treatment plans and behavior modification, or other positive methods invoking options of least restriction.

b)    The proposed Class may include subclasses.  In the event that discovery shows, or the Court determines, the proposed Class and/or Subclass cannot satisfy Federal Rule 23, Plaintiffs reserve the right to propose to modify or narrow the definition of Class or any subclasses.

c)      The Class Period is the date of SWITC's inception, through the date of filing of this Complaint (Class Period).

d)      The Class is ascertainable, as the names of all Class Members can be identified in business records maintained by Defendants.

159.    This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

160.    The Class is so numerous that joinder of all members is impractical.  Upon information and belief, there are hundreds of members of the proposed Class throughout Idaho and the United States, and possibly elsewhere.

161.    Questions of law and fact common to the Class predominate over questions affecting only individual Class Members. Such common questions include, but are not limited to, the following:

a)      Whether Defendants owed a duty of care to the Class;

b)      Whether Defendants' duty of care to the Class included a duty to protect SWITC residents from abuse, neglect and mistreatment.

c)      Whether Defendants' duty of care to the Class included a duty to supervise and train SWITC employees;

d)      Whether Defendants duty of care to the Class included a duty to properly assess SWITC residents and develop and implement appropriate individual active treatment programs for SWITC residents.

e)      Whether Defendants' conduct, including its policies and practices, exceeded the bounds of governing law, substantially departed from acceptable professional judgment, practices and standards of care, and violated principles of common decency, dignity,

morality and basic human rights.

        f)      Whether Defendants' abuse, neglect and mistreatment caused injury and harm to the Class as claimed herein.

        g)      Whether Defendants should be required to pay damages, including attorneys' fees and costs, resulting from the harm Defendants inflicted on the Class.

        h)      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class, including a requirement to develop and implement an Olmstead Plan

162.    Plaintiffs have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members, and are committed to the vigorous prosecution of this action

163.    Plaintiffs' claims are typical of the claims of the Class Members because they originate from the same wrongful policy and practices of Defendants, and because Defendants acted in the same way toward Plaintiffs and the Class.  Each of the Plaintiffs suffered abuse, neglect and mistreatment while residents of SWITC, and have suffered injuries and damages from Defendants' conduct.

164.    Defendants' actions and/or omissions toward the Class are identical or substantially similar, and arise out of a policy, procedure and common course of wrongful conduct of abuse, neglect and mistreatment, which caused injury and damage to Plaintiffs and the Class in a common and consistent manner.

165.    Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature and claims of the type asserted, and will fairly and adequately protect the interests of the Class.

166.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously and without unnecessary duplication and effort that would result from numerous individual actions.

167.     Individual litigation of the facts of all the individual cases would unduly burden the courts. Individual litigation would further present a potential for inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the Court system. Further, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs alleged herein. In contrast, a class action presents far fewer management difficulties and provides the benefit of single adjudication under the comprehensive supervision of a single court. Notice of pendency of the action and any resolution thereof can be provided to proposed Class Members by publication and/or other means.

168.     All allegations and claims are pled in the alternative to the extent required for proper construction under applicable state or federal law.

### COUNT I
### 42 U.S.C. §1983 – FOURTEENTH AMENDMENT

169.     Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

170.     Defendants are obligated to operate and implement SWITC and safeguard residents of SWITC, including Plaintiffs and Class Members, in a manner that does not infringe upon their federal and civil rights, including rights granted pursuant to the Fourteenth Amendment to the Constitution of the United States (Fourteenth Amendment), and by other federal law and/or state law.

171.     Defendants acted under color of state law and engaged in an official policy and/or

custom of abuse, neglect and mistreatment of Plaintiffs and Class Members using improper methods and restraints, including physical violence, psychological taunting, threats, and neglect, violating their federal rights as protected by the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983 (Section 1983).

172.    Defendants acted in clear violation of well-settled law of which reasonable persons would have been aware.

173.    Defendants' acts and omissions deprived Plaintiffs and Class Members of rights, privileges, or immunities secured or protected by the Fourteenth Amendment and federal law, including but not limited to the right to reasonably safe residential conditions, personal security, freedom from undue and unreasonable bodily harm and restraints, reasonable protection from harm, and adequate care, and freedom from threats, coercion and the right of due process causing Plaintiffs damages in an amount to be proven at trial, including attorneys' fees and costs.

174.    To the extent discovery in this action reveals SWITC is a program assisted with funds under the Developmental Disability Assistance and Bill of Rights Act (DD Act), Plaintiffs reserve the right to amend this Complaint to assert claims based upon violation(s) of the DD Act's contingency requirements to receive funds thereunder.

### COUNT II
### VIOLATION OF THE CONSTITUTION OF THE STATE OF IDAHO (ART. I, SEC. 1)

175.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

176.    Defendants' acts and omissions deprived Plaintiffs and Class Members of rights, privileges, or immunities secured or protected by the Article I, Section 7 of the Constitution of the State of Idaho, including but not limited to the right to reasonably safe conditions of habitation, personal security, freedom from undue and unreasonable bodily and emotional harm and restraints,

reasonable protection from harm, and proper treatment programs and plans, and freedom from threats and coercion, causing Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees and costs.

177.    Defendants acted in clear violation of well-settled law of which reasonable persons would have been aware.

## COUNT III
### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

178.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

179.    Defendants are obligated to provide treatment, support, and services to residents of SWITC consistent with the Americans with Disabilities Act (ADA) and implementing regulations. 42 U.S.C. § 12101 et seq., 28 C.F.R. 35.

180.    Defendants are obligated, consistent with the ADA and *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), to develop and implement a working plan to ensure that people with disabilities are living, learning, working and enjoying life in the most integrated setting appropriate to their needs and desires.

181.    Defendants' egregious, flagrant and inhumane acts and omissions violate Title II of the ADA and implementing regulations. 42 U.S.C. § 12101 et seq., 28 C.F.R. 35.

182.    Defendants have failed to develop or implement an *Olmstead* Plan.

183.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members were deprived of rights, privileges, or immunities secured and protected by federal law, and caused irreparable harm.

184.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members were denied access to the full utilization and benefit of treatment services based on disability status.

185.    As a result of Defendants' practices, Plaintiffs and Class Members were deprived equal access to a public entity's services, programs, and activities and were otherwise adversely affected as a member of the public accessing SWITC's programs and activities.

186.    Defendants conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees and costs.

### COUNT IV
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

187.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

188.    Defendants'' egregious, flagrant and inhumane acts and omissions violate Section 504 of the Rehabilitation Act and implementing regulations. 29 U.S.C. § 794, 34 C.F.R. 104.

189.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members were deprived of rights, privileges, or immunities secured and protected by federal law, and caused irreparable harm.

190.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members, by reason of disability, were excluded from the participation in, denied the benefits of, or subjected to discrimination while patients at SWITC.

191.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees and costs.

### COUNT V
### VIOLATION OF THE IDAHO HUMAN RIGHTS ACT

192.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

193.    Defendants are obligated to operate SWITC in a manner free from discrimination

and that does not infringe upon the rights of residents of SWITC as protected by the Idaho Human Rights Act (IHRA), Idaho Stat. § 67-5901, *et. seq.*, and other applicable law.

194.    Defendants' egregious, flagrant and inhumane acts and omissions constitute a pattern or practice that violated Plaintiffs' and Class Members' state rights as protected by the IHRA, including freedom from discrimination based on disability.

195.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees, costs, and such other and further relief as appropriate.  Plaintiffs reserve the right to amend this Complaint to seek punitive damages as allowed by applicable law.

**COUNT VI**
**42 U.S.C. §1983**
**NEGLIGENCE *PER SE***
**42 C.F.R. §483.420 / IDAPA 16.03.11.004.05**

196.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

197.    At all times material, SWITC participated in the Medicaid program, thereby subjecting SWITC the obligation to protect and ensure resident rights, as codified at 42 C.F.R. §483.420 and IDAPA 16.03.11.004.05.

198.    Defendants are obligated to operate and implement SWITC programs consistent with 42 C.F.R. §483.420 and IDAPA 16.03.11.004.01, 05, which includes, *inter alia,* ensuring that "clients are not subjected to physical, verbal, sexual or psychological abuse or punishment," promote and answer communications from clients' families promptly and appropriately, develop policies that "prohibit mistreatment, neglect or abuse of the client," and prohibit the use by staff of "physical, verbal, sexual or psychological abuse or punishment."

199.    Plaintiffs and Class Members are persons within the intended protection of 42

C.F.R. §483.420 and IDAPA 16.03.11.004.05.

200.    Defendants failed to comply with 42 C.F.R. §483.420 and IDAPA 16.03.11.004.05.

201.    Defendants egregious, flagrant and inhumane continuous acts and omissions constitute a pattern or practice of violating 42 C.F.R. §483.420 and IDAPA 16.03.11.004.05.

202.    The harm suffered by Plaintiffs and Class Members is of the type 42 C.F.R. §483.420 and IDAPA 16.03.11.004.05 was intended to prevent.

203.    Defendants conduct caused Plaintiffs and Class Members damages in amount to be proven at trial, including attorneys' fees and costs.

### COUNT VII
### 42 U.S.C. §1983
### NEGLIGENCE *PER SE*
### 42 C.F.R. §483.430 / IDAPA 16.03.11.004.06

204.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

205.    At all times material, SWITC participated in the Medicaid program, thereby subjecting SWITC the obligation to protect and ensure resident rights, as codified at 42 C.F.R. §483.430 and IDAPA 16.03.11.004.06.

206.    Defendants are obligated to operate and implement SWITC programs consistent with 42 C.F.R. §483.430 and IDAPA 16.03.11.004.06, which imposes obligations upon SWITC to ensure that SWITC's clients' active treatment program are integrated, coordinated and monitored by qualified professionals, that SWITC utilizes responsible direct care staff that are able to take prompt and appropriate action at all times, that sufficient direct care staff are on duty consistent with required staff-to-client ratios, and that staff receive appropriate and continuing training that allows each staff person to perform their duties effectively, efficiently and competently.

207.    Plaintiffs and Class Members are persons within the intended protection of 42 C.F.R. §483.430 and IDAPA 16.03.11.004.06.

208.    Defendants failed to comply with 42 C.F.R. §483.430 and IDAPA 16.03.11.004.06.

209.    Defendants continuous acts and omissions constitute a pattern or practice of violating 42 C.F.R. §483.430 and IDAPA 16.03.11.004.06.

210.    The harm suffered by Plaintiffs and Class Members is of the type 42 C.F.R. §483.430 and IDAPA 16.03.11.004.06 was intended to prevent.

211.    Defendants conduct caused Plaintiffs and Class Members damages in amount to be proven at trial, including attorneys' fees and costs.

**COUNT VIII**
**42 U.S.C. §1983**
**NEGLIGENCE *PER SE***
**42 C.F.R. §483.440 / IDAPA 16.03.11.004.07**

212.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

213.    At all times material, SWITC participated in the Medicaid program, thereby subjecting SWITC the obligation to protect and ensure resident rights, as codified at 42 C.F.R. §483.440 and IDAPA 16.03.11.004.07.

214.    Defendants are obligated to operate and implement SWITC programs consistent with 42 C.F.R. §483.440 and IDAPA 16.03.11.004.07, obligates SWITC to ensure that each resident receives a continuous active treatment program, "which includes aggressive, consistent implementation of a program specialized and generic training, treatment, health services and related services" directed to allow the resident to function with as much self-determination and independence as possible and "the prevention or deceleration of regression or loss of current optimal functional status."

215.    Plaintiffs and Class Members are persons within the intended protection of 42 C.F.R. §483.440 and IDAPA 16.03.11.004.07.

216.    Defendants failed to comply with 42 C.F.R. §483.440 and IDAPA 16.03.11.004.07.

217.    Defendants continuous acts and omissions constitute a pattern or practice of violating 42 C.F.R. §483.440 and IDAPA 16.03.11.004.07.

218.    The harm suffered by Plaintiffs and Class Members is of the type 42 C.F.R. §483.440 and IDAPA 16.03.11.004.07 was intended to prevent.

219.    Defendants conduct caused Plaintiffs and Class Members damages in amount to be proven at trial, including attorneys' fees and costs.

**COUNT IX**
**42 U.S.C. §1983**
**NEGLIGENCE *PER SE***
**42 C.F.R. §483.450 / IDAPA 16.03.11.004.08 / 16.03.11.501**

220.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

221.    At all times material, SWITC participated in the Medicaid program, thereby subjecting SWITC the obligation to protect and ensure resident rights, as codified at 42 C.F.R. §483.450 and IDAPA 16.03.11.004.08, and 16.03.11.501.

222.    Defendants are obligated to operate and implement SWITC programs consistent with 42 C.F.R. §483.450 and IDAPA 16.03.11.004.08, which imposes obligations which imposes obligations regarding SWITC's policies and practices with respect to conduct between staff and clients, management of client behaviors, and the use of physical restraints, among other obligations.

223.    Defendants are further obligated to operate and implement SWITC programs consistent with 42 C.F.R. §483.450 and IDAPA 16.03.11.501., which prohibits the "application of

painful or noxious stimuli and the use of enclosures."

224.    Plaintiffs and Class Members are persons within the intended protection of 42 C.F.R. §450 and IDAPA 16.03.11.004.08, and 16.03.11.501.

225.    Defendants failed to comply with 42 C.F.R. §483.450 and IDAPA 16.03.11.004.08, and 16.03.11.501.

226.    Defendants egregious, flagrant and inhumane continuous acts and omissions constitute a pattern or practice of violating 42 C.F.R. §450 and IDAPA 16.03.11.004.08, and 16.03.11.501.

227.    The harm suffered by Plaintiffs and Class Members is of the type 42 C.F.R. §483.450 and IDAPA 16.03.11.004.08, and 16.03.11.501 was intended to prevent.

228.    Defendants conduct caused Plaintiffs and Class Members damages in amount to be proven at trial, including attorneys' fees and costs.

## COUNT X
### NEGLIGENCE *PER SE*
#### IDAHO STATUTES § 16-1605 (VULNERABLE CHILDREN)

229.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

230.    At all times material, certain Plaintiffs and Class Members were vulnerable persons under the age of 18 who were abused and/or neglected within the meaning and protections of Idaho Statutes § 16-1605.

231.    Defendants" egregious, flagrant and inhumane acts and omissions constitute abuse and neglect as defined by applicable law.

232.    Certain Plaintiffs and Class Members are persons within the intended protection of Section 16-1605.

233.     Defendants failed to properly report the maltreatment of certain Plaintiffs and Class Members about which Defendants knew or should have known. This failure to report constituted violations by Defendants of Section 16-1605.

234.     The harm suffered by certain Plaintiffs and Class Members is of the type Section 16-1605 was intended to prevent.

235.     Defendants' conduct caused certain Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees and costs.

**COUNT XI**
**NEGLIGENCE *PER SE***
**IDAHO STATUTES § 39-5303 (VULNERABLE ADULTS)**

236.     Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

237.     At all times material, certain Plaintiffs and Class Members were vulnerable adults who were abused and/or neglected within the meaning and protections of Idaho Statutes § 39-5303.

238.     Defendants'' egregious, flagrant and inhumane acts and omissions constitute abuse and neglect as defined by applicable law.

239.     Certain Plaintiffs and Class Members are persons within the intended protection of Section 39-5303.

240.     Defendants failed to properly report the maltreatment of certain Plaintiffs and Class Members about which Defendants knew or should have known. This failure to report constituted violations by Defendants of Section 39-5303.

241.     The harm suffered by certain Plaintiffs and Class Members is of the type Section 39-5303 was intended to prevent.

242.    Defendants' conduct caused certain Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees and costs.

## COUNT XII
### ASSAULT

243.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

244.    Without consent or privilege, by an intentional act directed at Plaintiffs and Class Members, Defendants' caused Plaintiffs and Class Members apprehension or fear of immediate harm or offensive contact through the excessive and repeated use of coercion, threats, abuse, intimidation and neglect.

245.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

246.    Defendants possessed the ability to cause the harm or offensive contact.

247.    Plaintiffs and Class Members had reasonable apprehension or fear immediate harm or offensive contact would occur.

248.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial.

## COUNT XIII
### BATTERY

249.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

250.    Defendants intentionally caused harmful or offensive contact with the person of

Plaintiffs and Class Members or anything worn or held by or closely connected with them, without consent or privilege.

251.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

252.    Defendants' acts of causing Plaintiffs and Class Members to be abused, neglected and mistreated were offensive or harmful contacts against them, and they did nothing to provoke Defendants or cause Defendants to believe they were putting either themselves or others in a position of imminent severe bodily harm, thus warranting use of restraints.

253.    218. Defendants'' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial.

## COUNT XIV
### NEGLIGENCE

254.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

255.    Defendants owed Plaintiffs and Class Members a duty of care to keep them free from unlawful abuse, neglect and mistreatment and protect them from injury.

256.    Defendants failed to use reasonable care in their care and treatment of Plaintiffs and Class Members while residents of SWITC through the excessive and repeated use of physical and emotional abuse, neglect and mistreatment.

257.    Defendants' egregious, flagrant and inhumane acts and omissions breached their duty of care owed to Plaintiffs and Class Members.

258.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described

more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

259.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial.

**COUNT XV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

260.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

261.    Defendants' routine, excessive and repeated use of abuse, neglect and mistreatment was extreme and outrageous such that Defendants'' conduct exceeded the boundaries of decency and dignity, and is utterly intolerable to a civilized community.

262.    Defendants'' conduct was intentional and reckless.

263.    Defendants'' conduct caused Plaintiffs and Class Members severe emotional distress at the threat of being abused, neglected and mistreated for any behavior no matter how slight and unlikely to cause injury.

264.    The distress was so severe that no reasonable person could be expected to endure it.

265.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

266.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial.

## COUNT XVI
## MISREPRESENTATION

267.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

268.    Defendants have represented the SWITC program as follows:

The mission of SWITC, located in Nampa, is to provide services as a short-term therapeutic stabilization and transition center for clients, focused mostly on those who have been committed to the department because of criminal activity or severe behaviors. SWITC has become a stabilization center for individuals with intricate and challenging needs, with the goal of transitioning them to effective community placements for long-term services as quickly as possible.  DFW Facts, Figures and Trends (2018-2019), p. 51.

The mission of Southwest Idaho Treatment Center (SWITC) is to provide assessment, training, and treatment to people with developmental and intellectual disabilities until they can be transitioned back into their communities. Located in Nampa, SWITC collaborates with community partners to ensure individuals can be integrated back into their communities as soon as possible.  DFW Facts, Figures and Trends (2018-2019), p. 48.

269.    DHW further stated the mission of SWITC is a facility to "support . . . individuals in crisis to become stable, develop skills, and successfully transition to the community."

270.    Defendants, through their silence where there was an obligation to disclose, represented that SWITC programs would operate consistent with applicable state and federal law as to treatment of residents and not to engage in abuse, neglect and mistreatment of residents, and to provide appropriate active treatment services and plans.

271.    Defendants' misrepresentations regarding the type of treatment and care Plaintiffs and Class Members would receive in the SWITC program were material.

272.    Defendants knew at the time these misrepresentations were made that they were false and/or were made without the knowledge of whether they were true or false.

273.    Defendants knew and/or should have known Plaintiffs and Class Members did not receive the care and treatment represented through the acts and omissions of Defendants.

274.    These misrepresentations were made by Defendants with the intention of inducing Plaintiffs to justifiably rely on Defendants with respect to the placement of Plaintiffs and Class Members in the SWITC program.

275.    Plaintiffs relied and acted on Defendants' false representations.

276.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

277.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial.

## COUNT XVII
### NEGLIGENT MISREPRESENTATION

278.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

279.    Defendants have represented the SWITC program as follows:

The mission of SWITC, located in Nampa, is to provide services as a short-term therapeutic stabilization and transition center for clients, focused mostly on those who have been committed to the department because of criminal activity or severe behaviors. SWITC has become a stabilization center for individuals with intricate and challenging needs, with the goal of transitioning them to effective community placements for long-term services as quickly as possible.  DFW Facts, Figures and Trends (2018-2019), p. 51.

The mission of Southwest Idaho Treatment Center (SWITC) is to provide assessment, training, and treatment to people with developmental and intellectual disabilities until they can be transitioned back into their communities. Located in Nampa, SWITC collaborates with community partners to ensure individuals can be integrated back into their communities as soon as possible.  DFW Facts, Figures and Trends (2018-2019), p. 48.

280.    DHW further stated the mission of SWITC is a facility to "support . . . individuals in crisis to become stable, develop skills, and successfully transition to the community."

281.    Defendants, through their silence where there was an obligation to disclose, represented that SWITC programs would operate consistent with applicable state and federal law as to treatment of residents and not to engage in abuse, neglect and mistreatment of residents, and to provide appropriate active treatment services and plans.

282.    Defendants' misrepresentations regarding the type of treatment and care Plaintiffs and Class Members would receive in the SWITC program were material.

283.    Defendants failed to use reasonable care or competence in obtaining information regarding the type of care and treatment Plaintiffs and Class Members would receive while patients of the SWITC program.

284.    These representations were made by Defendants with the intention of inducing Plaintiffs and Class Members to justifiably rely on them in choosing the SWITC program.

285.    Plaintiffs and Class Members reasonably relied and acted on Defendants' false representations.

286.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

287.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial.

### COUNT XVIII
### CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES
### IDAHO STATUTES, SECTIONS 48-603, 48-608(1), (2)

288.    Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

289.     Defendants have represented the SWITC program as follows:

The mission of SWITC, located in Nampa, is to provide services as a short-term therapeutic stabilization and transition center for clients, focused mostly on those who have been committed to the department because of criminal activity or severe behaviors. SWITC has become a stabilization center for individuals with intricate and challenging needs, with the goal of transitioning them to effective community placements for long-term services as quickly as possible.  DFW Facts, Figures and Trends (2018-2019), p. 51.

The mission of Southwest Idaho Treatment Center (SWITC) is to provide assessment, training, and treatment to people with developmental and intellectual disabilities until they can be transitioned back into their communities. Located in Nampa, SWITC collaborates with community partners to ensure individuals can be integrated back into their communities as soon as possible.  DFW Facts, Figures and Trends (2018-2019), p. 48.

290.     DHW further stated the mission of SWITC is a facility to "support . . . individuals in crisis to become stable, develop skills, and successfully transition to the community."

291.     Defendants, through their silence where there was an obligation to disclose, represented that SWITC programs would operate consistent with applicable state and federal law as to treatment of residents and not to engage in abuse, neglect and mistreatment of residents, and to provide appropriate active treatment services and plans.

292.     Defendants' misrepresentations regarding the type of treatment and care Plaintiffs and Class Members would receive in the SWITC program were material.

293.     Defendants' methods, acts and/or practices in the conduct of is operation of SWITC was unconscionable because SWITC and DHW knowingly took advantage of SWITC residents who were unable to protect their own interest due to their disabilities

294.     SWITC and DHW represented the services provided at SWITC were of a particular quality or possessed of certain characteristics as herein described, when in fact they were not

295.     SWITC and DHW's practices were misleading, false and deceptive to consumers of the SWITC programs.

296.     Due to the conduct and practices of SWITC and DHW, residents suffered a loss of

assets in that their existing skills, including coping skills and daily activities, were degraded and lost.

297.    Plaintiffs and Class Members relied and acted on the false information and misrepresentations made by Defendants regarding the type of treatment and care Plaintiffs and Class Members would receive as residents of the SWITC program.

298.    Defendants' conduct caused Plaintiffs and Class Members damages in an amount to be proven at trial, including attorneys' fees, costs, disbursements, cots of investigation and other relief as determined by the Court.

## COUNT XIX
### WRONGFUL DEATH

299.    Plaintiffs hereby reallege all preceding and subsequent allegations of this Complaint as if restated in full herein.

300.    Upon receiving Drew Rinehart for care, SWITC assumed a duty to provide for his care, safety, and wellbeing in a reasonable manner under federal and state law.  Defendants did not do so, and instead provided Drew with reckless, willful, deceitful and wanton treatment and omissions of treatment that resulted in his death.

301.    SWITC failed to monitor Drew, train its employees, adequately staff its facility, or provide necessary therapeutic programming and a safe, stable living environment for Drew.

302.    Defendants' recklessness and intentional acts and omissions in leaving him unattended and unsupervised for six hours with his hands and feet bound resulted in Drew's death.

303.    By inflicting continuous and ongoing abuse, neglect and mistreatment as described more fully herein, Defendants acted with the intent to commit wrongful or unlawful acts without justification or excuse and/or intentionally and knowingly created an unreasonable risk of harm to others which involved a high degree of probability that harm would result.

304.   As a direct and proximate result of Defendants' negligent, grossly negligent, intentional, reckless, willful, wanton or otherwise tortious conduct, Drew died, causing damage and loss in an amount to be determined at trial.

## COUNT XX
### INJUNCTIVE RELIEF

305.   Plaintiffs reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

306.   Defendants' practice involving the excessive, repeated and unlawful routine abuse, neglect and mistreatment, violated and will continue to violate the rights, privileges and immunities of residents of SWITC secured and protected by federal and state law.

307.   Defendants' practices, procedures, and abuse, neglect and mistreatment are capable of repetition but evading review.

308.   SWITC residents will be subjected to the same harm as Plaintiffs and Class Members and will be deprived of their rights, privileges, or immunities secured and protected by federal and state law unless enjoined through temporary and permanent injunctive relief.

309.   The exact amount of damages cannot be determined, and therefore, there is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demand judgment against Defendants as follows:

A.   The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and applicable law.

B.   The Court certify the Class as follows: Class Members (Class) consist of residents of SWITC subjected to repeated, excessive and improper abuse, neglect and mistreatment as a means of behavior modification, intimidation, coercion, discipline, convenience and/or retaliation;

as well as any appropriate subclasses;

C.     The Court appoint Plaintiffs as Class Representatives for the Class;

D.     The Court appoint Plaintiffs'' Counsel of record as Counsel for the Class;

E.     Temporarily and permanently enjoining Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participation with them from any further infliction of abuse, neglect and mistreatment on SWITC residents;

F.     Enter a permanent injunction requiring Defendants to take such actions as will ensure that lawful and humane treatment and care of SWITC residents including the assessment, development and implementation of appropriate active treatment plans consistent with their individual needs and applicable law;

G.     Plaintiffs and Class Members receive judgment for all damages, as allowed by and consistent with applicable law, in an amount to be proven at trial;

H.     Plaintiffs recover their reasonable attorneys' fees, costs, disbursements, interest, and costs of investigation, as allowed by and consistent with applicable law, including without limitation as provided by 42 U.S.C. §1988 and other applicable law; and

I.     Such other and further relief as this Court deems just and equitable

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues and claims asserted herein as allowed by and consistent with applicable law.

Respectfully submitted,

Dated: June 12, 2019            **CK Quade Law, PLLC**

_____   /s/ Sean R. Beck

Charlene K. Quade (ISB No. 6921)
Sean R. Beck (ISB No. 7992)

C.K. Quade Law, PLLC
600 E. Riverpark Ln., Ste. 215
Boise, Idaho 83706
Telephone: (208) 367-0723
Facsimile: (208) 639-6400
char@charquadelaw.com
sean@charquadelaw.com

and

**O'MEARA, LEER, WAGNER & KOHL, P.A.**
Shamus P. O'Meara (MN#221454) (*pro hac vice pending)*
Mark R. Azman (MN#237061) (*pro hac vice pending*
7401 Metro Boulevard, Suite 600
Minneapolis, MN 55439-3034
(952) 831-6544
Email:  spomeara@olwklaw.com
         mrazman@olwklaw.com

**ATTORNEYS FOR PLAINTIFFS**