Charlene K. Quade (ISB No. 6921)
Sean R. Beck (ISB No. 7992)
C.K. Quade Law, PLLC
600 E. Riverpark Ln., Ste. 215
Boise, Idaho 83706
Telephone: (208) 367-0723
Facsimile: (208) 639-6400
char@charquadelaw.com
sean@charquadelaw.com

and

Shamus P. O'Meara (MN#221454) (*pro hac vice*)
Mark R. Azman (MN#237061) (*pro hac vice*)
O'Meara, Leer, Wagner & Kohl, P.A.
7401 Metro Boulevard, Suite 600
Minneapolis, MN 55439-3034
Telephone: (952) 831-6544
Facsimile: (952) 831-1869
spomeara@olwklaw.com
mrazman@olwklaw.com

**ATTORNEYS FOR PLAINTIFFS**

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Erika Dreyer, as parent and natural guardian of B.B., *et al*,<br><br>Plaintiffs,<br><br>v.<br><br>Idaho Department of Health and Welfare, an agency of the State of Idaho, *et al.*;,<br><br>Defendants. | Case No. 19-cv-211 (REB)<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS AND JOINING DEFENDANTS' MOTIONS TO DISMISS [DOCS. 37 AND 38]** |

In their opening briefs, Defendants attempt to wrongly focus attention on themselves rather than addressing their abusive conduct directed against vulnerable citizens in their care. This is the same empty ploy Defendants used in soliciting the Idaho Legislature for a new treatment facility,

but which DisAbility Rights Idaho (DRI) recognized as a wholly misguided narrative:

> DRI believes that the responsibility for this situation [of abuse and neglect] lies with the SWITC Administration, <u>personnel</u>, and IDHW. Instead of looking inside and accepting responsibility for the abusive and neglectful acts of its staff, SWITC and IDHW chose to blame the residents. They chose to blame the very people who they are responsible under law to care for. They chose to blame Idaho's most vulnerable citizens.

Amended Complaint, at Ex. A [7-1], at p. 10 (underlining added).  Defendants and Joining Defendants fail to acknowledge or accept responsibility for the neglect, abuse and mistreatment Plaintiffs and many others similarly situated have suffered at their hands.  This case is meant to change that, and change the way SWITC is operated, by providing proper treatment programs for SWITC residents, accountability and training for staff and administration, and an end to abuse and neglect once and for all.

The pending motions to dismiss (Docket Nos 37 and 38) should be denied.  In this Memorandum, "Defendants" refers to those moving parties identified in the Motion at Docket No. 37, and "Joining Defendants" refers to those moving parties identified in Docket No. 38.[1]

## ARGUMENT

### A.     STANDARD OF ANALYSIS

Defendants are pursuing dismissal under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  Invoking Rule 12(b)(1), Defendants contend that Plaintiffs' lack standing of certain claims.  "To establish standing, a plaintiff must demonstrate a personal stake in the outcome of the litigation . . . thus ensuring that the Federal Judiciary respects the proper – and properly limited – role of the courts in a democratic society."  *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (internal quotations and citations omitted).  The courts "enforce that requirement by insisting that

---

[1]     While the Court permitted Plaintiffs to file separate briefs for both pending motions (*see* Order [Doc. 40]), Plaintiffs submit this single brief responding to both motions.

2

a plaintiff satisfy the familiar three-part test for Article III standing: that he (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (internal quotations and citations omitted).

Under Rule 12(b)(6), the movant seeks to challenge the legal sufficiency of the claims in the Complaint. *Isbelle v. Denney*, No. 1:19-CV-00093-DCN, 2019 WL 5580951, at *1 (D. Idaho Oct. 29, 2019) (citing *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011)). "A complaint generally must satisfy the notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) to avoid dismissal under a Rule 12(b)(6) motion." *Isbelle*, at *1. Rule 8(a)(2), however, "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (internal quotations and ellipsis omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "In other words, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Isbelle*, at *2 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations in the pleading under attack," but need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.* (citations and quotations omitted).[2]

Plaintiffs have suffered very real harm through the acts, omissions and conduct of Defendants and Joining Defendants. They were abused, neglected and mistreated. They were hit, slapped, knocked down, and left for dead. DisAbility Rights Idaho investigated and agreed. The

---

[2]    "Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (quotations and citations omitted).

Idaho Office of Performance Evaluations investigated and identified widespread systemic failures at SWITC.  Governor Little agreed with OPE, and so did legislators.  Even DHW's own Director, Dave Jeppesen, conceded a lack of accountability at SWITC.   Defendants cannot ignore the universal agreement of the abuse and failures at SWITC; their motions should be denied.

## B.    THE IDAHO CONSTITUTION PERMITS THE REMEDIES SOUGHT BY PLAINTIFFS.

Defendants and Joining Defendants assert that no private person may be heard to complain of violations of Idaho Constitution because there is no "direct cause of action for violations of the Idaho Constitution."  Defendants' Memo. [Doc. 37-1], at p. 9.  The seminal reasoning for this argument appears to be the lack of statutory authority in Idaho creating such a cause of action analogous to a Section 1983 claim under federal law.  *See Hancock v. Idaho Falls Sch. Dist.*, No. CV-04-537-E-BLW, 2006 WL 1207629, at *3 (D. Idaho May 2, 2006).  But that did not stop Judge Winmill from *granting* summary judgment to the Plaintiffs on their state constitutional claim on reconsideration in *Hancock.  Hancock v. Idaho Falls Sch. Dist. No. 91*, No. CV-04-537-E-BLW, 2006 WL 2095264, at *2 (D. Idaho July 27, 2006) (". . . and because the Court has already granted summary judgment in favor of Hancock on his federal freedom of speech and association claim, the Court will now grant summary judgment in favor of Hancock on his state constitution claim as well.").  And just a few months ago, Magistrate Judge Dale refused to dismiss three claims against the State of Idaho based on the Idaho Constitution.  *See Bear Crest Ltd. LLC v. Idaho*, No. 4:18-CV-00469-CWD, 2019 WL 3220575, at *5 (D. Idaho July 17, 2019) (including claims under Idaho Constitution, Art. I, §13 prohibiting the deprivation of life, liberty or property without due process).   Defendants and Joining Defendants failed to cite these compelling decisions to this

Court.[3]

Defendants further fail to cite to the plethora of Idaho state court decisions going back decades that have permitted state constitutional claims to proceed, including those based on the provision invoked by Plaintiffs.[4]  *See, e.g., Berry v. Summers*, 76 Idaho 446, 451, 283 P.2d 1093, 1095 (1955) (reliance on Idaho Constitution, Art. I, §§ 1 and 13 to invalidate actions as violative of state constitution); *Chambers v. McCollum*, 47 Idaho 74, 272 P. 707 (1928) (constitutional challenge based on, *inter alia*, the Idaho Constitution, Art. I, § 1); *Rowe v. City of Pocatello*, 70 Idaho 343, 348, 218 P.2d 695, 698 (1950) (same); *Nelson v. Boundary Cty.,* 109 Idaho 205, 211, 706 P.2d 94, 100 (Ct. App. 1985) (same).

Moreover, other jurisdictions have recognized a right of action under a state constitution despite the lack of a statutory scheme akin to Section 1983.  *See, e.g., Am. Civil Liberties Union of Minnesota v. Tarek ibn Ziyad Acad.*, 788 F. Supp. 2d 950, 957 (D. Minn. 2011)(despite authority rejecting private cause of action under Minneota Constitution, court permitted such constitutional claims to proceed where several cases allowed such claims based on provisions at issue); *Cruz-Guzman v. State*, 916 N.W.2d 1, 9-10 (Minn. 2018) (permitting constitution claim to proceed, and stating "It is well within the province of the judiciary to adjudicate claims of constitutional violations.").

---

[3]        Defendants may be prompted to revise their argument, and contend that damages claims are not permitted by the Idaho Constitution, but Plaintiffs have also asserted a right to injunctive relief.  *See* Amended Complaint [Doc. 7], at Count XX, p. 53.  By analogy, the Courts have permitted money damages for violations of the *federal* constitution in the absence of statutory authority.  *See, e.g., Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 390, 91 S. Ct. 1999, 2002, 29 L. Ed. 2d 619 (1971); *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980).

[4]        Plaintiffs' Idaho constitutional claim is asserted at Count II of the Amended Complaint [Doc. 7], at p. 36.  The title of the count correctly references Section 1 of Article I, but paragraph 195 inadvertently states Section 7, instead of Section 1.

This Court should deny Defendants' request to dismiss Count II.[5]

## C.   PLAINTIFFS' ADA (COUNT III) AND REHABILITATION ACT (COUNT IV) CLAIMS ARE ACTIONABLE.

Defendants and Joining Defendants contend, with little analysis, that Plaintiffs' failed to identify a service, program or activity they were denied or any discrimination that occurred.  *See* Defendants Memo [Doc. 37-1], at p. 11; Joining Defendants Memo [38], at p. 3.  Defendants are incorrect.

Title II of the ADA, as alleged by Plaintiffs' at Count III, applies to state governments.  42 U.S.C. §12131.  Title II declares that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Id*. §12132.  The Ninth Circuit has instructed that the language of the ADA is to be construed "broadly to advance its remedial purpose."  *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).  The ADA, the Ninth Circuit further explained, "aims to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities."  *Id*., at 694 (quoting 42 U.S.C. § 12101(b)(2)).  "Congress enacted the statute on the premise that discrimination against the disabled is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect."  *Id*. (quoting *Alexander v. Choate,* 469 U.S. 287, 295 (1985).

To state a prima facie case under the ADA or the Rehabilitation Act[6], a plaintiff must

---

[5]     Similarly, the Court should deny Joining Defendants request to dismiss Count II. *See* Joining Defendants Memo [38], at p. 3.

[6]     "There is no significant difference in analysis of the rights and obligations created by the ADA and [RA]." *Twede v. Univ. of Washington*, 309 F. Supp. 3d 886, 899 (W.D. Wash. 2018) (citing *See Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)). A prima facie case under the RA must also prove that the relevant program receives federal

allege:

> (1) she is an individual with a disability; (2) she has otherwise qualified to participate or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her disability.

*Twede v. Univ. of Washington*, 309 F. Supp. 3d 886, 899 (W.D. Wash. 2018) (citing *Sheehan v. City & Cty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014) rev'd on other grounds, 135 S.Ct. 1765 (2015)). A "qualified individual with a disability" is a person "with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. §12131(2).[7]

SWITC's failure to provide legally required assessments, treatment, support and services to residents on a system-wide basis is well known after intense investigation, and resulted in numerous licensing citations even *after* SWITC claimed any deficiencies were corrected. Amended Complaint [7], at ¶¶49, 70. As SWITC's administrative director, Ms. Newton, conceded that most SWITC residents have serious behavioral histories and SWITC residents presented a danger to themselves and others. *Id.* Yet, armed with this knowledge, Ms. Newton and SWITC failed to implement comprehensive assessments and effective treatment plans, and instead blamed residents for their behaviors. *Id.* Licensing authorities further found that SWITC staff failed to

---

financial assistance. *See Wagon v. Rocklin Unified School District*, 2019 WL 2577336 (E.D. Cal. June 24, 2019). There can be no legitimate objection to the fact that SWITC receives federal funds. *See* Amended Compl., Ex. A [7-1], at p. 22 & n.31.

[7]    Defendants do not challenge Plaintiffs' status as qualified individuals with disabilities.

provide guardians with sufficient information to make informed decisions and took action with

respect to residents without permission.  *Id.*

DRI has found that SWITC has consistently failed to offer the treatment, services, and protections that it is by law obligated to provide to those in its care. SWITC failed to implement proven evidence-based treatments and practices to reduce altercations and injuries. SWITC ignored or, in some cases, condoned staff for taking actions that were likely to result in altercations and injuries. SWITC failed to prioritize resident safety. SWITC failed to properly train its staff to protect those in its care.  SWITC failed to employ sufficient numbers of people to complete its mission.

These failures are significant and consequential. It bears repeating that since the passage of the Secure Treatment Facility Act in 2017, almost half of the residents at SWITC have been victims of physical abuse, sexual abuse, psychological abuse, or neglect committed by SWITC staff, resulting in hospitalizations and even death. Additionally, the Bureau of Facility Standards inspected SWITC on no less than seven (7) occasions, resulting in hundreds of pages of documented deficiencies, including multiple instances where residents were placed in "immediate jeopardy," multiple instances where SWITC failed to meet required staffing levels, and multiple instances where SWITC failed to provide active treatment. These issues, combined with the facility's woefully inadequate response to acts of abuse and neglect, have created a cycle of abuse, neglect, and injury, affecting every person at the facility from the moment they are admitted until their discharge or, in some cases, death.

This cycle permeates through every level of facility operation, from resident care and treatment, to facility oversight and incident response. It begins before residents even step through the door, with inadequate policies, practices, and procedures that fail to prioritize the health and safety of those who are required to live at SWITC above all else.  It continues on to admission, with the facility's failure to conduct proper assessments in order to identify each individual's behavioral and other health needs. Without proper assessment, appropriate plans and programs cannot be developed. When such plans are developed, the administration has repeatedly failed to employ enough staff to implement the plans. Those who are employed to work directly with residents are not adequately trained or supervised in order to ensure such programs and plans are implemented as prescribed by professional staff. As the cycle continues, untrained and poorly supervised staff commit acts of abuse or neglect on residents, resulting in injuries to both residents and staff. If reported, such acts are poorly investigated. Once investigated, they are not adequately addressed. Corrective actions are not implemented, not suitable to address the issue at hand, and often fail to hold supervisory and other professional staff accountable. Despite repeated assurances by the facility's administration that such inadequacies have been corrected, the circumstances that gave rise to each level of this vicious cycle persist and the cycle

continues.

*See* Amended Compl., Ex. A [7-1], at pp. 11-12 (emphasis added); *see also* p. 10 (SWITC failed to meet its "legal obligations to provide treatment and supervision").

In sum, not only was SWITC staff, including by definition Ms. Newton, failing to provide mandated assessments, treatment and services to residents, they were effectively hiding critical information from guardians and family and thereby obstructing informed decision-making.  There is no reasonable explanation for such conduct other than blatant and intentional[8] discrimination against Plaintiffs and other SWITC residents as persons with disabilities, as vulnerable adults, and ostensibly, as persons with, as Ms. Newton describes, "serious behavioral issues" that have been placed at SWITC and essentially forgotten.  *See* Amended Complaint [Doc. 7], at ¶¶203, 209 (alleging discrimination based on disability); *see also Brown ex rel. Thomas v. Fletcher,* 624 F. Supp. 2d 593, 607 (E.D. Ky. 2008) (allegations of exclusion from services sufficient to survive motion to dismiss).  SWITC further failed to provide proper staff (Amended Complaint, at ¶¶71-75), failed to provide proper policies (Amended Complaint, at ¶¶64-67).

Lastly, to the extent Plaintiffs' ADA and Rehabilitation Act claims are asserted against individuals, such claims are treated as official capacity claims.[9]  *Byerly v. Doe*, No. 1:19-CV-00230-BLW, 2019 WL 4667670, at *7 (D. Idaho Sept. 24, 2019); *Abbott v. Rosenthal*, 2 F. Supp. 3d 1139, 1144 (D. Idaho 2014).

---

[8]    One cannot *accidentally* fail to provide statutorily required services.  *See* 42 C.F.R.§483.440(a); IDAPA 16.03.11.400.

[9]    The same hold true for Joining Defendants.  *See* Joining Defendants Memo [38], at p. 3.

**D.   THE IDAHO HUMAN RIGHTS ACT (COUNT V) IS A VIABLE CLAIM BECAUSE EXCEPTIONS APPLY TO DEFENDANTS' EXHAUSTION ARGUMENT**

Defendants and Joining Defendants also seek dismissal of Plaintiffs' claim (Count V) under the Idaho Human Rights Act (IHRA), claiming without citation that the individual defendants do not fall within the meaning of persons who "own, lease or operate" a place of public accommodation under Idaho Code 67-5909(6).  *See* Defendants' Memo. [37-1], at p. 13; Joining Defendants Memo [38], at p. 4.  However, the definition of "person" includes individuals (I.C. §67-5902(5)), and "place of public accommodation" means "any business, accommodation . . . of any kind, whether licensed or not, whose . . . services, facilities, privileges, advantages or accommodations are extended, offered . . . or otherwise made available to the public." *Id.* §67-5902(9).  The individual defendants (including Joining Defendants) certainly fall within these confines as individuals who participated in the operation of SWITC.  On these grounds, Defendants and Joining Defendants motion to dismiss should be denied.

Defendants arguments that a complaint must first be filed with the Idaho Commission of Human Rights also fails.  Idaho Code section 67-5908(2) provides that a "complaint must be filed with the [Idaho Commission of Human Rights] as a condition precedent to litigation."  *See also Bryant v. City of Blackfoot*, 137 Idaho 307, 312, 48 P.3d 636, 641-42 (2002).  The Idaho courts, however, have approached administrative exhaustion with great caution, and generally have not required a party to affirmatively allege exhaustion "in order to state a cognizable claim.  Instead, failure to exhaust is an affirmative defense." *El-Shaddai v. Zamora*, 833 F.3d 1036, 1044 (9th Cir. 2016); *see also Jones v. Bock*, 549 U.S. 199, 212 (2007) (holding better rule of law is so to view failure to exhaust as an affirmative defense); *see also Andrus v. U.S. Dept. of Energy*, 200 F.Supp.3d 1093, 1101 (D. Idaho 2016) (noting "exhaustion is a jurisprudential doctrine, rather

than a jurisdictional one."). [10]

More importantly, over sixty (60) years ago, Idaho Supreme Court recognized there are exceptions to exhaustion:

> While as a general rule administrative remedies should be exhausted before resort is had to the courts to challenge the validity of administrative acts, such rule is not absolute and will be departed from where the interests of justice so require, and the rule does not apply unless the administrative agency acts within its authority.

*Bohemian Breweries v. Koehler*, 332 P.2d 875, 879 (Idaho 1958). The Idaho courts continue to hold that view. *See Ricks v. State Contractors Bd.*, 164 Idaho 689, 694, 435 P.3d 1, 6 (Ct. App. 2018), *review denied* (Mar. 12, 2019) (noting exceptions to exhaustion "(a) when the interests of justice so require, and (b) when the agency acted outside its authority."). Another recognized exception to exhaustion "applies where bias or prejudgment by the decisionmaker can be demonstrated. *Owsley v. Idaho Industrial Com'n*, 106 P.3d 455, 461 (Id. 2005). "This is because the due process clause entitles a person to an impartial and disinterested tribunal." *Id*. ("The constitutional requirement that an adjudicator be free from bias applies equally to the courts and to state administrative agencies. * * * To require a litigant to exhaust administrative remedies before a biased decisionmaker would also be futile." *Id*. at 461-62.

The Idaho Commission on Human Rights is charged with investigating complaints filed with the Commission alleging violations of the Idaho Human Rights Act. *See* I.C. §67-5906(1). The Commission is contained within the office of the governor, and the governor appoints all nine members of the Commission, subject to the advice and consent of the senate. *Id*. §67-5903. The Idaho Department of Health and Welfare is an executive department of Idaho (I.C. §67-2402), and,

---

[10]    A claim may be subject to dismissal under a non-enumerated Rule 12(b) motion for failure to exhaust, but only when that "affirmative defense . . . appears on its face." *El-Shaddai*, at 1044. That circumstance does not apply in this case.

the "supreme executive power of the state" is constitutionally vested in the governor. *Id.* § 67-2401. The administrative head of the DHW is the director, who is appointed by the governor, subject to the advice of the senate. *Id.* §§67-2403(1), 2404(1).

Under these circumstances, filing a complaint with the Commission would result in the State investigating itself. Based on its litigation tactics in this case, its refusal to accept responsibility for the abuse and neglect of Plaintiffs and others similarly situated, and the unequivocal conclusions of DRI and OPE, the State has already rejected responsibility to Plaintiffs (and potential class members), and instead has blamed the victims. Forcing a filing with the Commission would not only add insult to injury, but it surely is not within the interests of justice, would be a hopeless and futile exercise, and would require review in a biased environment.[11] *See Johnson v. Bonner County School District No. 82*, 887 P.2d 35, 38 (Id. 1994 ("various situations have been identified which teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.") (quoting *Withrow v. Larkin*, 421 U.S. 35, 47).

The interests of justice further do not support mandating persons with diminished capacity to recognize and act upon the complexities of statutory construction or discern an ostensible need for administrative review of discrimination, all while simultaneously suffering abuse, neglect and mistreatment, and an ongoing refusal by their care providers to provide basic care and protection.

---

[11]     Exceptions to exhaustion are commonly considered in a variety of contexts by Idaho state and federal courts. *See, e.g., Fuchs v. State of Idaho,* 272 P.3d 1257, 1261 (Id. 2012) (liquor license); *Lochsa Falls LLC v. State,* 207 P.3d 963 (Id. 2009) (land use permit); *Ricks v. State Contractors' Board*, 435 P.3d 1, 6 (Id. Ct. App. 2018), *rev. denied* (Mar. 12, 2019) (contractor licensing); *Waldron v. FDIC,* 935 F.3d 844, 851 (9th Cir. 2019) (noting judicially created exception to exhaustion requirement under FIRREA); *Paul G v. Monterey Peninsula Unified School District,* 933 F.3d 1096, 1100 (9th Cir. 2019) (noting exceptions to IDEA exhaustion); *Lecates v. Blue Cross of Idaho*, 2016 WL 4974950 (D. Idaho Sept. 16, 2016) (health plan).

**E.**     **COUNTS X, XI, XII, XIII, XV, XVI AND XVIII ARE SUFFICIENTLY PLED.**

**1.**     **Counts X and XI (Negligence Per Se)**

Defendants and Joining Defendants have asked the Court to dismiss Counts X and XI for insufficient factual allegations of their failure to report abuse imposed and suffered by Plaintiffs to the Idaho Commission on Aging, DHW, or law enforcement was the proximate cause of Plaintiff's injuries.  Such assertions are misplaced.

Plaintiffs' negligence per se claims in Counts X and XI are based on Idaho Code § 16-1605 (vulnerable children) and Idaho Code § 39-5303 (vulnerable adults).  Idaho Code § 16-1605(1) states:

> [any] person having reason to believe that a child under the age of eighteen (18) years has been abused, abandoned or neglected or who observes the child being subjected to conditions or circumstances that would reasonably result in abuse, abandonment or neglect shall report or cause to be reported within twenty-four (24) hours such conditions or circumstances to the proper law enforcement agency or the department.

Idaho Code § 39-5303(1) states:

> [A] state-licensed or certified residential facility serving vulnerable adults . . . who has reasonable cause to believe that a vulnerable adult is being or has been abused, neglected or exploited shall immediately report such information to the commission.

Plaintiffs' Amended Complaint outlines instances demonstrating Defendants' knowledge of abuse and neglect that occurred at SWITC.  Plaintiffs' Complaint alleges Mr. King was present and witnessed Defendant Jason Miller abuse Nathan Benjamin.  (*See* Amended Compl., ¶ 163.) In violation of Idaho Codes § 16-1605(1) and § 39-5303(1), Mr. King failed to report the abuse to the proper governmental agencies.

In her role as the administrative director of SWITC, Ms. Newton should have known, and had reason to know, of the rampant abuse and neglect at SWITC.  Information such as residents at

SWITC not being checked on every 30 minutes and falsified log sheets reflects negligence in her role as the administrative director.  Defendants Combs and Luper's neglect in checking on the residents every 30 minutes was the proximate cause of injuries to some of the residents, and in this case, leading to the death of Drew Rinehart.  As the administrative director, working in a certified residential facility serving vulnerable adults and taking care of children under the age of eighteen, Ms. Newton should have reported this neglect to the proper governmental agencies.  Thus, Ms. Newton's failure to report is a violation of both Idaho Code § 16-1605(1) and § 39-5303(1).  *See* Amended Compl, Ex. A [Doc. 7-1], at p. 64 (noting 15 times the "Administrator" or "Administrator on Duty" failed to report allegations of abuse or neglect).  Joining Defendants are also implicated, based on Plaintiffs' allegations that none of the defendants reported the abuse and neglect occurring at SWITC.  *See* Amended Compl., at ¶¶252, 259; Amended Compl., Ex. A [Doc. 7-1], at p. 22 ("SWITC did not consistently report all allegations of abuse or neglect to Adult Protection.  Of those it did report, not all were reported within the specific timeframes outlined in I.C. §39-5303."); p. 64 (discussing numerous failures of staff and administrators failing to report).

The above instances alleged in the Amended Complaint put the individual defendants on notice of the abuse or occurrence they failed to report, and counters their arguments that the Amended Complaint does not put them on notice of specific abuse or occurrence.

Further, to support their arguments asking the Court dismiss Count X and XI, Defendants cite *O'Guin v. Bingham Cty.,* 122 P.3d 308, 311 (Idaho 2005), outlining elements that must be met when a common law duty of care is replaced by a statue or regulation.  The four elements are:

> (1) the statute or regulation must clearly define the required standard of conduct;
> (2) the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused;
> (3) the plaintiff must be a member of the class of persons the statute or regulation was designed to protect; and
> (4) the violation must have been the proximate cause of the injury.

*Id.*

Plaintiffs satisfy all four elements.  First, Idaho Codes § 16-1605 and § 39-5303 clearly define the required standard of conduct, in that the individual defendants had a duty to report abuse, abandonment or neglect, and failed to do so.  Second, its unquestionable the type of harm endured by Plaintiffs is what Idaho Codes § 16-1605 and § 39-5303 are intended to prevent.  Third, Plaintiffs were and are individuals – some under the age of eighteen – with developmental disabilities.  Thus, some of these individuals fall under the umbrella of minors and others are considered vulnerable adults as part of a class Idaho Codes § 16-1605 and § 39-5303 are designed to protect.  Finally, the individual defendants' conduct, or lack thereof, was the proximate cause of injuries, abuse, and even death, to the respective Plaintiffs.

The Amended Complaints pleads more than enough facts to state a claim to relief that is plausible on its face and the Court should allow this Count to stand.

2.      **Count XII (Assault)**

Defendants contend that Ms. Newton, Ms. Combs, and Ms. Luper's failures related to falsifications of the observation log sheets and that Mr. Kings failure to intervene during instances of abuse do not constitute assault are also misplaced.  The collective actions or omissions of these Defendants, in conjunction with the actions of other Defendants, lead Plaintiffs and others similarly situated to live under constant fear and threat while at SWITC.

An assault, as cited by Defendants, is "an unlawful threat of or offer to do bodily harm or injury to another."  *Miller v. Idaho State Patrol*, 252 P.3d 1274, 1289 (Idaho 2011).  Direct violence or offensive contact is unnecessary to constitute an assault.  *See Hammer v. Ribi*, 401 P.3d 148, 152 (Id. 2017) ("requirement of an overt physical act is generally not necessary to prove [civil assault]"); 6A C.J.S. Assault § 6 (2019).  Although the specific Defendants named in this

particular motion may not have any offensive *contact* with Plaintiffs or others similarly situated, as argued by Defendants, *contact* is not required to constitute assault.  Assault relies on the *apprehension of fear* that contact with one's person can result.

Contrary to Defendants' arguments, Plaintiffs' Complaint articulates instances showing Defendants' intent to cause Plaintiffs to believe something bad was about to or would happen to them – the very definition of assault.  *See* Compl. ¶¶ 54, 103, 104, 117, 126, 131, 143, 164.[12] Further, the evidence clearly shows that SWTIC staff  "threatened [residents] with acts of physical violence if they did not comply with staff's orders."  *Id.*, at Ex. A [Doc. 7-1], at p. 8, 19-20. Examples of assault are disturbing:

> Staff called a resident a "smartass," then told the resident to "shut up!" while raising their fist, threatening to punch the resident if they did not comply.

> Staff told a resident "you get involved with staff, you're going to get hurt.  That's how it ends.

*Id.* [Doc. 7-1], at pp. 19-20.  The Supreme Court requires factual allegations sufficient to provide Defendants of notice of the claims against them, and that the claims are plausible.  *See Ashcroft v. Iqbal,* 556 U.s 662, 677-78 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007).  There could not be more direct or explicit allegations of assault, which unquestionably satisfy *Twombly* and *Iqbal*.

Additional concerns are raised by Defendants' arguments.   By alleging insufficient allegations, Defendants are effectively exploiting Plaintiffs disabilities.  The Amended Complaint alleges Plaintiffs are non-verbal (or deceased), cognitively impaired, under guardianship or otherwise unable to fully express the details of their abusive treatment at SWITC (and SWITC has

---

[12] This is not intended to be an exhaustive list of abuse towards Plaintiffs or others similarly situated at SWITC but rather to point out to the Court some instances of abuse in the Complaint.

rejected information requests, citing ongoing litigation).  The Amended Complaint is more than sufficient to allow the assault claims to proceed.

The Amended Complaint pleads sufficient facts to state a claim to relief that is plausible on its face and the Court should allow this Count to stand.

### 3.  Count XIII (Battery)

Civil battery consists of an intentional contact with another person that is either unlawful, harmful, or offensive.  *Miller*, 252 P.3d at 1287 (citing *Neal v. Neal,* 873 P.2d 871, 876 (Idaho 1994)).  Lack of consent is a critical element of battery.  252 P.3d at 1287.

Defendants ask the Court to dismiss Plaintiffs' battery complaint based on a lack of any specific facts where physical contact was made with Plaintiffs – citing only ¶269 of the Amended Complaint.  However, just like the assault allegation above, Plaintiffs have outlined numerous instances of battery throughout the Complaint.  Plaintiffs call the Court's attention to the following paragraphs in the Complaint that show the intentional, unlawful, harmful or offensive contact Defendants had with Plaintiffs and others similarly situated.  (*See* Amended Compl. ¶¶ 100, 128, 129, 130, 132, 137, 138, 146, 154, 156, 162, 163, 169.)[13]

Thus, Plaintiffs' Complaint pleads enough facts to state a claim to relief that is plausible on its face and the Court should allow this Count to stand.

### 4.  Count XV (Intentional Infliction of Emotional Distress (IIED))

To make a claim for intentional infliction of emotional distress (IIED), Plaintiffs need to satisfy these four elements: "(1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful

---

[13] This is not intended to be an exhaustive list that demonstrates prima facie allegations of battery.

conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe." *Payne v. Wallace*, 32 P.3d 695, 698 (Idaho Ct. App. 2001). "Although it is not necessary to show that the plaintiff's emotional distress resulted in a physical manifestation, liability for intentional infliction of emotional distress arises only when the emotional reactions are 'so severe that no reasonable [person] could be expected to endure it.'" *Id*. (citation omitted).

"In evaluating whether distress is sufficiently severe, [courts] consider, among other factors, whether the plaintiffs incurred any physical damage *or* were hampered in the performance of their daily functions or suffered a severely disabling emotional response." *Alderson v. Bonner*, 132 P.3d 1261, 1269 (Idaho Ct. App. 2006) (citation omitted) (emphasis added).

Some Plaintiffs were minors, or still are, when they were put under constant emotional distress by Defendants. Although their ages as minors does not lessen the requirement that their actual distress be severe, their "age and attendant vulnerability are factors to be considered in determining whether a defendant's conduct was sufficiently outrageous or reckless to give rise to liability, and *a child may suffer severe anguish from conduct that would not be likely to cause such reactions in an adult*." *Payne*, 32 P.3d at 699 (emphasis added). Furthermore, "[w]hether a plaintiff has suffered the requisite severe distress is ordinarily a question for the jury…." *Alderson*, 132 P.3d at 1269.

In their motion to dismiss this Count, Defendants argue two main points. *See* Defendants Memo [37-1], at pp. 19-20. First, Defendants rely on the notion that, in order for Plaintiff to make an IIED claim, "there must be a physical manifestation of the plaintiff's emotional injury, which is designed to provide a degree of genuineness that claims of mental harm are not imagined." *Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013). Second, Defendants argue they do not know how they intentionally caused emotional distress to Plaintiffs.

In addressing Defendants first argument, the requirement of a physical manifestation of the plaintiff's emotional injury is applicable to *negligent* infliction of emotional distress, not IIED claims. *See Id.* Therefore, Defendants' use of this authority is mistaken.

Defendants second argument that they do not know how they intentionally caused emotional distress to Plaintiffs is also without merit. The Amended Complaint outlines various instances showing Defendants put Plaintiffs and others similarly situated under constant emotional distress, including some who were and are minors.

For example, before his death, Defendants put Plaintiff Drew Rinehart under constant emotional distress when they repeatedly took away his personal belongings, prevented him from speaking with his family on the phone, and would not allow him to have a relationship with his sister, mother, and grandmother, knowing full well that Drew took great comfort in his relationship with his sister and grandparents. *See* Amended Compl. ¶ 118. In another example of the emotional distress suffered by Plaintiffs, Michael McNamar suffered abuse which caused him Post-Traumatic Stress Disorder. *Id.* ¶ 126. Furthermore, the staff at SWITC were aware of Michael's struggles, including when touched by others. With this knowledge of Michael's needs, SWITC staff (Defendants) repeatedly put their hands on Michael during his difficult times, exacerbating his difficulties. *Id.* ¶ 129. Due to the stress Michael was constantly under, he began identifying as female. *Id.* ¶ 148. To make matters worse, staff members at SWITC taunted and made fun of Michael because of being transgender. *Id.* These examples show the severity of the emotional distress Plaintiffs were constantly under by Defendants during their stay at SWITC.[14]

Plaintiffs' Complaint pleads enough facts to state a claim to relief that is plausible on its

---

[14] These examples are not intended to be an exhaustive list of abuse but rather to highlight instances of abuse in the Amended Complaint.

face and the Court should allow this Count to stand.

### 5.    Count XVI (Misrepresentation)

For Plaintiffs to prove a claim of misrepresentation based on SWITC's mission statement, the following elements must be shown: (1) [the statement's] representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that the representation be acted upon by the hearer; (6) the hearer's ignorance of the falsity; (7) the hearer's reliance that the statement was true; (8) the hearer's right to rely on the truthfulness; and (9) the hearer's proximate injury. *Thomas v. Med. Ctr. Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002).

As alleged in the Amended Complaint, Defendants and Joining Defendants, represented to the public, citizens of Idaho, Plaintiffs and other similarly situated that SWITC's mission "is to provide services as a short-term therapeutic stabilization and transition center for clients with intricate and challenging needs, with the goal of transitioning them to effective community placement for long-term services as quickly as possible." Amended Compl. ¶¶1, 43, 287.  SWITC seeks to "support  . . . individuals in crisis to become stable, develop skills, and successfully transition to the community." *Id*. ¶ 43.

Plaintiffs were placed at SWITC because of the assistance and care represented was going to be provided and the type of help that was represented was available to Plaintiffs.

Defendants and Joining Defendants had a duty to protect and take care of Plaintiffs and to ensure their safety and well-being as they worked to transition back to their families and community.  Instead, there was rampant abuse, neglect, and emotional distress suffered by Plaintiffs while at SWITC.  This is clearly contrary to the mission of supporting Plaintiffs becoming more stable, developing skills, and successfully transitioning them back to their communities.

Since Defendants and Joining Defendants had a duty from a relationship of trust with Plaintiffs, arising from SWITC's mission, as represented by Defendants and Joining Defendants, Plaintiffs are not required to prove their knowledge of the falsity regarding the statement or representation of fact, or Defendants' and Joining Defendants' intent that Plaintiffs rely on the statement or representation of fact, to sustain a claim for misrepresentation. *See Gray v. Tri-Way Const. Servs.*, Inc., 210 P.3d 63, 71 (Idaho 2009).

The Amended Complaint pleads enough facts to state a claim to relief that is plausible on its face and the Court should allow this Count to stand.

Notwithstanding the arguments above demonstrating that Plaintiffs have satisfied all nine elements needed to prove misrepresentation, there are strong public policy considerations this Court should consider. SWITC's mission statement, and the mission statement of any organization irrespective of their purpose, is intended to represent to the outside world what the organization is about and the services they intend to provide to individuals that engage with them. People are drawn to organizations based upon these expectations. Expectations that, in part, are based on the purported mission statement of the organization as expressed by the organization's representatives (like Defendants in this case). If the Court does not hold Defendants and Joining Defendants accountable for the misrepresentations, it will effectively grant leeway to other organizations to develop misleading statements meant to entice relationships on false grounds, as perpetrated in this case.

### 6.    Count XVIII (Consumer Fraud)

Plaintiffs have alleged cognizable consumer fraud claims against Defendants and Joining Defendants. Under section 48-602(1), the definition of "person" includes "natural persons," which would include the individual capacity defendants in this case. Section 48-603 proscribes a number

of practices as deceptive and unfair, including:

> The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past, or is:
>
> * * *
>
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
>
> * * *
>
> (9) Advertising goods or services with intent not to sell them as advertised;
> (10) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;
>
> * * *
>
> (17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer.
> (18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C . . .

I.C. §48-603(7), (9), (10), (17).   "Services" means "work, labor or any other act or practice provided or performed by a seller to on behalf of a consumer."   *Id*. §48-602(7).   "Trade" and "commerce" means "the advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or services or distributing goods or services, either to or from locations within the state of Idaho, or directly or indirectly affecting the people of this state." *Id*. §48-602(2).   In reviewing whether an act was unconscionable, the courts *shall* consider several factors, including whether the violator "knowingly, or with reason to know, took advantage of a consumer reasonably unable to protect his interest because of . . . ignorance, illiteracy, inability to understand the language of the agreement or similar factor," "knowingly or with reason to know, induced the consumer to enter into a transaction that was excessively one-sided in favor of the

alleged violator," and whether "the sales conduct or pattern of sales conduct would outrage or offend the public conscience, as determined by the court." *Id.* §48-603C(2)(a), (c), (d); *see also In re Wiggins,* 273 B.R. 839, 872 (Bankr. D. Idaho 2001) (holding that exploitation of person with intellectual disability from brain damage was unconscionable).

Section 48-608(1) provides a vehicle for relief from conduct imposed on Plaintiffs:

> Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater; provided, however, that in the case of a class action, the class may bring an action for actual damages or a total for the class that may not exceed one thousand dollars ($1,000), whichever is the greater. Any such person or class may also seek restitution, an order enjoining the use or employment of methods, acts or practices declared unlawful under this chapter and any other appropriate relief which the court in its discretion may deem just and necessary. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper in cases of repeated or flagrant violations.

I.C. § 48-608(1); *see also Taylor v. McNichols*, 243 P.3d 642, 662 (Id. 2010) (ICPA claim is based on contractual relationship). Section 48-608(1) imposes enhanced damages where the victim was a person with a disability. *Id.* §48-608(2).

Defendants and Joining Defendants displayed conduct prohibited by Idaho's consumer protection laws. Plaintiffs' were residents of SWITC, and since SWITC cannot itself speak, the staff and employees spoke, who are the individuals that developed and represented SWITC was capable of providing the specialized therapeutic services needed by Plaintiffs, and which Plaintiffs expected, and were entitled, by agreement to receive and acquire. *See* Amended Complaint [7], at ¶¶ 68-70, 308-316.[15] Plaintiffs alleged that the individual defendants represented the treatment

---

[15]   As a Medicaid provider, SWITC is paid for its services through a combination of state and federal funds. *See* Amended Complaint, Ex. A [Doc. 7-1], at p. 22 & n. 31. SWITC

and care at SWITC was of a particular standard, when in fact it was not, advertised services without the intent to provide such services or to supply such services as expected, mislead Plaintiffs concerning the services, and that such conduct was unconscionable. *Id*. This conduct is precisely the type of unfair practices the ICPA was designed to address. Plaintiffs' 48-608(1) losses were clearly described in the Amended Complaint as property in the form of the lost assets of degraded coping skills, daily life skills and related items. Amended Complaint [7], at ¶315. The movants have failed to direct the Court or Plaintiffs to any authority to the contrary.

The individual defendants' motion to dismiss should be denied.

**F.     COUNTS VI, VII, VIII AND IX PRESENT LEGALLY PLAUSIBLE, VIABLE AND ACTIONABLE SECTION 1983 CLAIMS.**

"Section 1983 creates a cause of action against any person who, acting under color of state law, abridges rights, privileges, or immunities secured by the Constitution and laws of the United States." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 936 (9th Cir. 2003) (citing 42 U.S.C. §1983). Only violations of rights, not laws, give rise to actions under Section 1983. *Id*. (citing *inter alia Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353 (1997)). "Under the *Blessing* test, a particular statutory provision gives rise to a federal right if three requirements are met: (1) Congress must have intended that the provision in question benefit the plaintiff, (2) the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence, and (3) the statute must unambiguously impose a binding obligation on the States." *Anderson v. Ghaly*, 930 F.3d 1066, 1073 (9th Cir. 2019) (citations and quotations omitted).

Defendants and Joining Defendants' cursory request for dismissal ignores recent case law

---

residents, thus, purchase SWITC's services through their Medicaid eligibility.

directly on point, which applied the *Blessing* test, and concluded "without difficulty" that
individually enforceable rights have been created as alleged by Plaintiffs in this action. *Thrower
v. Pennsylvania*, 873 F.Supp.2d 651, 656 (W.D. Pa. May 31, 2012).  In *Thrower*, a resident of a
state operated intermediate care facility, like SWITC, died after the facility dispensed two
injections of medicine.  *Id*., at 652-53.  The resident's mother initiated suit against the state, the
facility and employees of the facility.  *Id*., at 653.  The suit asserted claims pursuant to Section
1983 for violations of the Medicaid Act (42 U.S.C. §§ 1396-1396v) and its implementing
regulations (42 C.F.R. §§483.400 *et seq.*).  The Court rejected the State's Rule 12(b)(6) motion,
reasoning:

> In the case *sub judice*, this Court must determine whether privately enforceable
> rights are created by §§ 1396a(a)(31) and 1396d(d) of the Medicaid Act and its
> implementing regulations, 42 C.F.R § 483.400, et seq. Section 1396a(a)(31)
> provides that a participating state "must—with respect to services in an
> intermediate care facility for [*persons with intellectual disabilities*] [,] ... provide ...
> each patient ... [with] a written plan of care ... and ... a regular program of
> independent professional review (including medical evaluation) which shall
> periodically review [the patient's] need for such services[.]" Section 1396d(d)
> defines the term "intermediate care facility for [*persons with intellectual
> disabilities*]" as an "institution (or distinct part thereof) for [*persons with
> intellectual disabilities*] or persons with related conditions" which, inter alia,
> "meets such standards as prescribed by the Secretary." The implementing
> regulations impose a litany of specific obligations on these facilities. See e.g., 42
> C.F.R. § 483.420 ("The facility must ensure the rights of all clients. Therefore, the
> facility must ... inform each client ... of the client's rights and the rules of the
> facilities[.] ) (emphasis added"); § 483.430 ("Each client's active treatment program
> must be integrated, coordinated and monitored by a qualified intellectual disability
> professional[.]").
>
> As the Third Circuit did in Sabree, this Court concludes "without difficulty" that
> the provisions at issue in this case create individually enforceable rights. First, the
> patients/clients are clearly the intended beneficiaries of these provisions which
> declare their rights and provide detailed descriptions of what facilities must do to
> ensure those rights. Second, the provisions are not vague or amorphous; to the
> contrary, they unequivocally define the rights of patients and the obligations of
> facilities. Third, these provisions unambiguously impose binding obligations on
> these state-run facilities, speaking clearly in terms of what the facilities "must" do.
> Finally, this Court finds that the above-cited provisions unmistakably confer

substantive treatment rights on patients in rights-creating terms.

Plaintiff has satisfied her burden of establishing that the statutory provisions in question create federally enforceable rights through § 1983. Consequently, the Court will reject Defendant's contention that Plaintiff cannot state a § 1983 claim on these grounds.

*Thrower*, at 656 (italicized brackets added).[16]

Defendants and Joining Defendants assertions that these claims fail merely elevates form over substance.  *See* Defendants Memo [37-1], at p. 14-15; Joining Defendants Memo [38], at p. 4.  The Ninth Circuit has stated that "regulations *alone* cannot create rights enforceable through either an implied right of action or Section 1983.  *Price v. City of Stockton*, 390 F.3d 1105, 1112 n.6 (9th Cir. 2004) (italics in original).  "We continue to recognize, however, that regulations may be relevant in determining the scope of the right conferred by Congress and therefore may be considered in applying the three-prong *Blessing* test."  *Id*.  Each of the regulations at issue in Counts VI, VII, VIII and IX, however, are grounded in specific sections of the Medicaid Act, codified at 42 U.S.C. §§ 1369a(a)(31) and 1396d(d).

Based on *Thrower*, Plaintiffs' allegations at Counts VI, VII, VIII and IX, satisfy *Price* and *Save Our Valley* because Plaintiffs have demonstrated that "a *statute* – not a regulation – confers an individual right."  *Save Our Valley v. Sound Transit*, 335 F.3d 932, 943 (9th Cir. 2003) (italics in original).[17]  Defendants and Joining Defendants motion to dismiss Counts VI, VII, VIII and IX should be rejected.[18]

---

[16]     *Thrower* does not expressly mention sections 483.440 and .450, but these sections provide similar safeguards as section 483.420 and .430 governing treatment plans and the interaction between staff and residents.  *See* 42 C.F.R. §§440 (governing active Treatment services) and 450 (governing client behaviors).

[17]     To the extent explicit reference in the Amended Complaint should include the above cited U.S. Code sections of the Medicaid Act or revise the labeling to strike reference to negligence, Plaintiffs respectfully request permission to amend the Amended Complaint.

[18]     Having failed to substantively address the issue, Defendants ostensibly recognize

**G.    THE *INDIVIDUAL-CAPACITY* DEFENDANTS ARE NOT ENTITLED TO IMMUNITY FROM COUNTS XII, XIII, XV AND XVI.**

Individual-capacity Defendants King, Newton, Combs and Luper and Joining Defendants Miller and Edwards seek dismissal of Counts XII (Assault), XIII (Battery), XV (IIED) and XVI (misrepresentation), alleging the affirmative defense of immunity protects them.  The Court should reject these arguments.

"The purpose of the [Idaho Tort Claims Act] is to provide much needed relief to those suffering injury from the negligence of government employees." *Rees v. State, Dep't of Health & Welfare*, 143 Idaho 10, 19, 137 P.3d 397, 406 (2006) (internal quotations omitted).  "The ITCA is to be construed liberally, consistent with its purpose, and with a view to attaining substantial justice." *Id*.  "Therefore, under the ITCA liability is the rule and immunity is the exception." *Id*.

In essence, Defendants are seeking to litigate the case at the Rule 12 stage of the proceedings.  As clearly stated by the Idaho Supreme Court, the assertion of immunity is an affirmative defense.  *Hammer v. Ribi*, 162 Idaho 570, 574, 401 P.3d 148, 152 (2017); *see also Sadid v. Vailas*, 943 F.Supp.2d 1125, 1136 (D. Id. 2013) (treating immunity as affirmative defense).  Theoretically, only the defenses enumerated in Rule 12(b)(6) can be raised by motion, with affirmative defenses intended to be asserted by responsive pleading under Rule 8(c).  *See* 5B Fed. Prac. & Proc. Civ. § 1349 Presentation of Defenses and Objections—Motions to Dismiss, (3d ed.).  "[O]nly when the elements of the defense appear *on the face of the complaint*" may an affirmative defense serve as a basis for dismissal under Rule 12(b)(6).  *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) (italics in original); *cf. Hammer*, 162 Idaho at 575, 401 P.3d at 153 ("a

---

Plaintiff's rights to proceed against Defendants in their individual capacities on the state-law based claims of Counts VI, VII, VIII and IX.  *See* 42 U.S.C. §1367(a) (granting supplemental jurisdiction to this Court on state law claims); Defendants' Memo. [37-1], at pp. 14-15.

complaint is not subject to dismissal simply because it does not negate an affirmative defense.").

Under the Idaho Tort Claims Act, immunity is available if the defendant acts without malice or criminal intent.  Idaho Code §6-904(3).  "Malice" has been defined as "the intentional commission of a wrongful or unlawful act without legal justification or excuse, whether or not the injury was intended.  *Thomas v. Cassia Cty., Idaho*, No. 4:17-CV-00256-DCN, 2019 WL 5270200, at *10 (D. Idaho Oct. 17, 2019) (quoting *James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2016)).  "Criminal intent" means "the intentional commission of what the person knows to be a crime."  *Id*.  "Thus, if an employee of a governmental entity, acting within the course and scope of his employment, intentionally commits a crime or a wrongful or unlawful act without legal justification or excuse, section 6–904(3) will not shield him."  *Id*.  As stated in *Curtis v. City of Gooding*, section 6-904(3) does not immunize and employee if she either (1) was not acting within the scope of employment, or (2) was acting with malice or criminal intent.  844 F.Supp.2d 1101, 1108 (D. Id. 2012) (citing *Hoffer v. City of Boise*, 257 P.3d 1226, 1229 (Id. 2011)).

Here, Plaintiffs clearly allege that the individual capacity defendants, including Defendants King, Newton, Combs and Luper, and Miller and Edwards, acted with malice by committing wrongful or unlawful acts or omissions without justification.  *See* Amended Compl. [7], at ¶¶163-64, 172, 263, 264, 270, 271, 293, 295.  Surely the Defendants do not contend that the continuous and ongoing physical and mental abuse, neglect and mistreatment was not wrongful or unlawful, or that such conduct occurred by 'accident,' including the intentional and knowing conduct of Ms. Newton to officially allow the falsification of resident records (as to, e.g., Mr. Rinehart) leading to a resident's death.[19]

---

[19]      Contrary to Defendants' contention, an allegation that Defendants were acting outside the scope of their employment is not necessary if malice is asserted.  *See Thomas*, 2010 WL 5270200, *10.  Further, Defendants' vague allegation that the elements of assault, battery and

Joining Defendants argue that Count XV (IIED) should also be dismissed on immunity grounds to the extent it is based on a claim of assault, battery or misrepresentation, with a general cite to section 6-904. Joining Defendants Memo [38], at p. 7-8. Contrary to Joining Defendants implication, Plaintiffs have not manipulated the legal theories upon which Count XV rests. To be sure, IIED is a distinct and well recognized tort in Idaho, dating back to at least 1980. *See Yeend v. United Parcel Serv., Inc.*, 659 P.2d 87, 88 n.1 (1982). In *James v. City of Boise*, 376 P.3d 33 (2016), the Court identified the elements of a claim for IIED:

> In order to establish a claim of intentional infliction of emotional distress, the plaintiff must prove that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) there was a causal connection between the defendant's wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe.

*James,* at 51 (citations omitted).[20] Joining Defendants motion to dismiss Count XV (IIED) based on immunity grounds should be denied.[21]

## H.   PLAINTIFF JAMIE FORURIA HAS STANDING TO ASSERT A WRONGFUL DEATH CLAIM.

Defendants are again putting the cart before the horse. Plaintiff Jamie Foruria clearly has standing to assert a wrongful death action in Count XIX for the death of Drew Rinehart. There are two elements to prove a wrong wrongful death action: "(1) that an actionable wrong was committed by the defendant against the decedent, and (2) that the same actionable wrong caused

---

misrepresentation are deficient relies on no citation, no recitation of the elements of the claims, and no substantive discussion. *See* Defendants Memo. [37-1], at p. 27. Lacking any substantive argument to which Plaintiffs can respond, such position should be rejected. *See* L.R.7.1(b) (moving party's brief must be contain "all of the reasons and points and authorities relied upon.").

[20]   It is noteworthy that Defendants have not sought dismissal of Count XV on immunity grounds, suggesting at least an implicit recognition that IIED is not an exempted tort under 6-904 (it is not listed).

[21]   Plaintiffs do not contest the request for dismissal of Count XVII (Negligent Misrepresentation).

the decedent's death." *Castorena v. Gen. Elec.*, 238 P.3d 209, 219 (2010).  Idaho Code §5-311, the controlling statute for purposes of this issue, defines who may pursue a wrongful death action: "When the death of a person is caused by the wrongful death or neglect of another, his or her heirs *or* personal representatives on their behalf may maintain an action for damages against the person causing the death . . ." I.C. §5-311(a) (italics added); *see also Hagy v. State*, 51 P.3d 432, 437 (Id. 2002) (construing "'personal representative' to mean the personal representative of the *decedent*, not of the *heirs*.  Thus, an action may be maintained for wrongful death of a person by the decedent's heirs or the decedent's personal representative on behalf of the heirs" (italics in original)).[22]  The definition of "heir" was revised in 2010, to mean a surviving spouse, or persons "entitled under the statutes of intestate succession to the property of a decedent." I.C. §15-2-201(22).  Intestate succession in Idaho is prescribed by sections 15-2-101, *et seq.*  For purposes of this wrongful death action, section 15-2-103 governs intestate succession, and provides that anything not passing to the surviving spouse (Mr. Rinehart was not married at the time of his death), passes to his issue (he had no children), or if none are surviving, to his parent, or if no parent is surviving, then to issue of the parents or either of them.  I.C. §15.2-103(a)-(c); *see also Estate of DiMaggio v. United States*, 770 Appx. 326, 327 (9th Cir. 2019).  As of this writing, Mr. Rinehart is survived by his mother and six siblings.

The Defendants' arguments are puzzling, in the least.  In this case, Ms. Foruria is the duly

---

[22]     Section 5-311(a) further states that "In every action under this section, such damages may be given as under all the circumstances of the case as may be just."  "A recovery may not be had under the [Idaho] wrongful death statute for grief and anguish suffered by surviving relatives of the deceased, but it may be had for loss of society, companionship, comfort, protection, guidance, advice, intellectual training, etc. * * * General damages, such as loss of society and companionship, will be presumed upon the death when he plaintiff is the spouse, parent or child of the decedent."  *Kucirek v. Jared*, 2019 WL 1431231, at *6 (D. Idaho Mar. 29, 2019) (internal quotations and citations omitted).

appointed personal representative of the Estate of Drew Rinehart, and is obviously pursuing this action on behalf of Mr. Rinehart's heirs, including his mother as the current person with the greatest priority under Idaho's intestacy statutes.[23]   Defendants' request to dismiss Count XIX should be denied.

I.     **THE ALLEGATIONS INVOLVING PLAINTIFF B.B. ARE PLEAD TO PROVIDE MORE THAN SUFFICIENT NOTICE TO DEFENDANTS.**

Despite their arguments, the Amended Complaint provides more than sufficient details involving the abuse, neglect and mistreatment of Plaintiff B.B at SWITC.  B.B. has severe and profound developmental and intellectual disabilities and though he is 13 years old, he functions at the level of a 15 month old, and is nonverbal.  It is therefore impossible for B.B. to express the abuses he suffered, or the mistreatment he endured, or the neglect he experienced, or importantly, who inflicted these punishments.  His mother, Plaintiff Dryer, has endeavored to explain in the Amended Complaint [Doc. 7], at ¶¶88-106, what she has observed and experienced with respect to B.B.'s treatment at SWITC.  Obviously *someone* at SWITC committed these acts upon B.B., and for these reasons, Plaintiffs sued not only named individuals, but also "John and Jane Does 1-100."  Further, the Amended Complaint expressly states that the SWITC failed to provide active services treatment as required state and federal law, that B.B. needed such services, and that Defendants were deprived of such services based on disability status.  *See* Amended Complaint [Doc. 7], at ¶¶68-70, 97, 203.

B.B.'s claims are factually strong and provide overwhelming notice to Defendants of the claims asserted against them.  Defendants' motion to dismiss B.B.'s claims should be denied.

---

[23]     To the extent Defendants persist in demanding strict compliance with hyper-technical pleading technicalities, Plaintiffs respectfully request this Court allow Plaintiffs to amend the Amended Complaint.

**J.     THE COURT SHOULD PERMIT AMENDMENT OF THE AMENDED COMPLAINT TO NAME THE CORRECT DEFENDANT AS LUKE GUSHWA.**

During the undersigned's investigation of this matter, it was learned that an individual named Luke Brisbane inflicted abuse, neglect and mistreatment on one of Plaintiffs.  It was subsequently learned that this individual's name is actually Luke Gushwa, and Mr. Gushwa was served with the Summons and Complaint on August 18, 2019.  *See* Affidavit of Service [Doc. 26].  To the extent a further amendment of the Amended Complaint results from these motions, this issue will be resolved.  Otherwise, Plaintiffs will pursue amendment by stipulation or, if needed, motion.

<u>**CONCLUSION**</u>

This Court should deny Defendants and Joining Defendants' respective motions to dismiss.  The movants' challenges to the legal sufficiency or plausibility of Plaintiffs claims under Rule 12(b)(6) must fail, as the Amended Complaint (and exhibits) have provided robust factual assertions underlying such claims.  After having been told by DRI, OPE, the Bureau of Facility Standards, and now by this action (and given Defendants response to the DRI Report[24]), the movants cannot reasonably suggest that they have insufficient notice of the claims in this case.  Similarly, movant's challenge to standing under Rule 12(b)(1) fails because Ms. Foruria is pursuing a wrongful death claim on behalf of the heirs of Drew Rinehart.

---

[24]     *See* Amended Compl., Ex. A, Appendix A [Doc. 7-1].

Respectfully submitted,

November 22, 2019

**CK QUADE LAW, PLLC**                          **O'MEARA, LEER, WAGNER & KOHL, P.A.**

*s/ Sean R. Beck*                                  *s/ Shamus P. O'Meara*
_____        _____
Charlene K. Quade (ISB No. 6921)          Shamus P. O'Meara (MN#221454) (*pro hac vice*)
Sean R. Beck (ISB No. 7992)                 Mark R. Azman (MN#237061) (*pro hac vice*)
C.K. Quade Law, PLLC                          7401 Metro Boulevard, Suite 600
600 E. Riverpark Ln., Ste. 215               Minneapolis, MN 55439-3034
Boise, Idaho 83706                              (952) 831-6544
Telephone: (208) 367-0723                     spomeara@olwklaw.com
Facsimile: (208) 639-6400                      mrazman@olwklaw.com
char@charquadelaw.com
sean@charquadelaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of November, 2019, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Cynthia Lin Yee-Wallace
cynthia.wallace@ag.idaho.gov

Megan Ann Larrondo
megan.larrondo@ag.idaho.gov

Emma C. Nowacki
enowacki@gfidaholaw.com

Michael Edward Kelly
mek@kellylawidaho.com

Trudy Hanson Fouser
tfouser@gfidaholaw.com

Dated: November 22, 2019                         *s/ Mark R. Azman*
                                         _____