UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERIKA DREYER, as parent and natural guardian of B.B., et al., | Case No. 1:19-cv-00211-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| IDAHO DEPARTMENT OF HEALTH AND WELFARE, an agency of the State of Idaho, et al., | |
| Defendants. | |

## I. INTRODUCTION

Pending before the Court is Defendants State of Idaho, Idaho Department of Health and Welfare, Southwest Idaho Treatment Center, Jamie Newton, Billy King, Debra Luper, and Debra Combs' (collectively "Defendants") Motion to Dismiss (Dkt. 58), as well as Defendants Jason Miller, Leondre Edwards, Paul Tompkins, and Jolene Bergs' (collectively "Joining Defendants") Motion to Dismiss (Dkt. 59). These Defendants' Motions are based upon Federal Rule of Civil Procedure 12(b)(6) and assert the factual allegations in Plaintiffs' Second Amended Complaint (Dkt. 50) are insufficient to support their claims. Additionally, one of the newly-named Defendants—Roger Arment—has filed a Motion to Dismiss pursuant the Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process. Dkt. 64.

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). Upon review, and for the reasons set forth below, the Court GRANTS in PART and DENIES in PART Defendants and Joining Defendants Motions to Dismiss,[1] and DENIES Arment's Motion to Dismiss for insufficient service.

## II. BACKGROUND

On June 12, 2019, Plaintiffs filed a Class Action Complaint and Request for Injunctive Relief. Dkt. 1. On July 8, 2019, Plaintiffs filed an Amended Class Action Complaint and Request for Injunctive Relief. Dkt. 7. In their First Amended Complaint, seven named Plaintiffs asserted twenty causes of action against eleven named Defendants and 100 "John and Jane Does." Dkt. 7, at 1–2. Defendants State of Idaho, the Idaho Department of Health and Welfare, Southwest Idaho Treatment Center, Jamie Newton, Billy King, Debra Luper, and Debra Combs, subsequently moved to dismiss various claims in the First Amended Complaint. Dkt. 37. Soon after, Defendants Jason Miller and Leondre Edwards joined in the request. Dkt. 38. The Court held a hearing on the motions on February 20, 2020, and took the matters under advisement. Dkt. 48.

---

[1] Defendants Brandon McGee and Corbin Burkett did not participate in either Motion to Dismiss. The Office of the Idaho Attorney General ("AG") filed a Motion to Withdraw as Burkett's Counsel on 9/18/2019. Dkt. 32. The Court granted the AG's Motion and directed Burkett to appoint another attorney to appear on his behalf or to appear in person. Dkt. 33. The Court directed Burkett to file a notice with the Court stating how he will be represented in this case. Dkt. 33. To date, Burkett has failed to do so. McGee was served on August 30, 2020, but has also failed to appear. Dkt. 67.

On April 20, 2020, the Court issued an Order dismissing Counts II, V, VI, VII, VIII, IX, X, XI, XII, XIII, XV, XVI, XVII and XVIII in their entirety, Counts III and IV as to the individual capacity defendants, and all claims by Plaintiff B.B. Dkt. 49. The Court granted Plaintiffs an opportunity to cure the deficiencies in the First Amended Complaint by filing a Second Amended Complaint. *Id.* Additionally, after informal communication with the Court, Defendants agreed to provide Plaintiffs with limited and informal discovery. Although Defendants provided over 10,000 documents, Plaintiffs assert that Defendants refused to produce the personnel files of the individual capacity Defendants and other potentially crucial information. Dkt. 61, at 9. Plaintiffs filed their Second Amended Complaint on August 13, 2020. Dkt. 50.

The Second Amended Complaint bears many similarities in form and substance to the First Amended Complaint, but there are significant differences as well. In the Second Amended Complaint, seven named Plaintiffs assert fifteen causes of action against fifteen named Defendants and 100 "John and Jane Does." Dkt. 50, at 1–2. Plaintiffs again explain that the purpose of this case is to address "widespread abuse, neglect and mistreatment inflicted on current and former residents, including Plaintiffs and others similarly situated, of the Southwest Idaho Treatment Center ("SWITC"), a program operated by the Idaho Department of Health and Welfare ("DHW"), by known and unknown SWITC staff and condoned by SWITC administrators and DHW." Dkt. 50, at 3.

SWITC is a state-run institution known as an "intermediate care facility"[2] that offers short-term crisis care for individuals with intellectual and developmental disabilities ("I/DD") who also have some combination of medical, behavioral, and/or mental health needs. SWITC has been in existence since the early 1900s. SWITC's campus was originally a 600-acre long-term placement facility that could house 1,000 residents. In 2009, however, Idaho developed and implemented an Olmstead plan[3] aimed at transitioning SWITC's residents, some of whom had lived at SWITC for years, into the community.

All of the individuals at SWITC have an I/DD, which is a cognitive impairment. Some residents have been committed to the care of DHW due to criminal activity or

---

[2] 42 U.S.C § 1396d(d) defines "intermediate care facility": as follows:

(d) Intermediate care facility for mentally retarded

The term "intermediate care facility for the mentally retarded" means an institution (or distinct part thereof) for the mentally retarded or persons with related conditions if--

(1) the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and the institution meets such standards as may be prescribed by the Secretary;

(2) the mentally retarded individual with respect to whom a request for payment is made under a plan approved under this subchapter is receiving active treatment under such a program; and

(3) in the case of a public institution, the State or political subdivision responsible for the operation of such institution has agreed that the non-Federal expenditures in any calendar quarter prior to January 1, 1975, with respect to services furnished to patients in such institution (or distinct part thereof) in the State will not, because of payments made under this subchapter, be reduced below the average amount expended for such services in such institution in the four quarters immediately preceding the quarter in which the State in which such institution is located elected to make such services available under its plan approved under this subchapter.

[3] An Olmstead plan is a state's plan to deinstitutionalize individuals with I/DD and increase the number of those individuals utilizing community-based support. It derives from the U.S. Supreme Court's landmark decision in *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581 (1999).

because they have been found to be a threat to themselves or others. Other individuals are at SWITC because there is no other available community-based support that can successfully provide them care. Some residents have unusually high medical needs, and/or significant mental health diagnoses.

In 2017, SWITC resident Drew Rinehart died. That same year, SWITC failed two surveys performed by DHW, and six staff members left or were fired following substantiated abuse allegations by SWITC residents. When SWITC became aware of the abuse allegations in 2017, it alerted DisAbility Rights Idaho ("DRI"), an advocacy and protection group with federal authority to monitor and investigate conditions in facilities that serve individuals with I/DD. SWITC shared thousands of pages of documents with DRI. DRI reviewed those documents and drafted a report on its "findings." The Idaho Office of Performance Evaluations ("OPE") also completed a report on SWITC's operations, which was conducted in response to a legislative inquiry in March of 2018. Relying on these reports, Plaintiffs' family members and guardians filed this lawsuit, asserting a variety of federal and state law claims against Defendants. Defendants and Joining Defendants assert that various claims in Plaintiffs' Second Amended Complaint lack factual and legal plausibility and must be dismissed under Federal Rule of Civil Procedure 12.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of

sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 678, 682 (2009).

In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Id*. at 663. A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly*, the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See Harris v. Amgen*, Inc., 573 F.3d 728, 737 (9th Cir. 2009).

# IV. DISCUSSION

## A.  Counts IV-VII - § 1983 Claims

### 1. Federal Rights Issue

Defendants argue that Counts IV through VII of the Second Amended Complaint should be dismissed without leave to amend because 42 U.S.C. § 1396a(a)(31) ("§ 1396a(a)(31)") does not confer any federal rights upon the Plaintiffs, making redress under 42 U.S.C. § 1983 ("§ 1983") unavailable. Dkt. 58-1, at 5–9. The Court disagrees.

Counts IV, V, VI, and VII of the Second Amended Complaint are near analogues to Counts VI, VII, VIII, and IX of the First Amended Complaint. In the First Amended Complaint, Plaintiffs couched these four claims as "42 U.S.C. § 1983 Negligence Per Se" claims, using federal and state regulations as the source of the duty. Dkt. 7, at 39–43. The Court dismissed those claims on the ground that they could not be pled "generally under § 1983," but welcomed Plaintiffs "to plead these claims as federal violations of the Medicaid Act—or any applicable state statute . . . ." Dkt. 49, at 12. Plaintiffs did so in the Second Amended Complaint, recharacterizing the §1983 "Negligence Per Se" claims as violations of § 1396a(a)(31), 42 U.S.C. §1396d(d)—and their implementing regulations. Dkt. 50, at 41–48. Defendants again move for dismissal of the § 1983 Claims, this time on the ground that § 1396a(a)(31) "does not confer federal rights unto plaintiffs to which they could seek redress under 42 U.S.C. § 1983." Dkt. 58-1, at 5. Thus, the issue the Court must address for Counts VI and VII turns on whether § 1396a(a)(31) creates a federal right under which

Plaintiffs can seek § 1983 relief.[4]

a. Legal Standard for the Creation of a Federal Right

It is well established that 42 U.S.C. § 1983 "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws,'" and that this provision "safeguards certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (cleaned up). However, in order for a plaintiff to seek relief under § 1983, the "plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Id.* (emphasis in original). Said differently, not all federal laws give rise to a federal right. The framework for discerning whether a federal statute creates a federal right is provided in *Blessing v. Freestone*, 520 U.S. 329 (1997)*.* There, the Supreme Court set forth a three-factor test to analyze this question. *Id.*

The first factor is whether Congress "intended that the provision in question benefit the plaintiff." *Id.* at 340. The Supreme Court has further clarified this prong of the analysis by holding that only "an unambiguously conferred right" can support a cause of action brought under § 1983. *Gonzaga U. v. Doe*, 536 U.S. 273, 283 (2002). To unambiguously confer a federal right, a statute's text "must be 'phrased in terms of the persons benefited,'" with "rights-creating terms." *Id.* at 284 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 (1979)). Moreover, the Ninth Circuit has consistently held that "[p]laintiffs suing

---

[4] Defendants point out, and the Court agrees, that § 1396d(d), merely provides the definition of an Intermediate Care Facility under the Medicaid Act and, therefore, does not confer enforceable rights onto the Plaintiffs.

under § 1983 must demonstrate that a statute—not a regulation—confers an individual right." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 943 (9th Cir. 2003). Implementing regulations "may be considered in applying the three-prong *Blessings* test," but ultimately, "the inquiry must focus squarely on Congress's intent." *Id.*

The second step in the *Blessing* analysis is whether the plaintiff can "demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence." *Blessing,* 520 U.S. at 340–41 (quoting *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 431–32 (1987).

Finally, the *Blessing* test requires that the statute must "unambiguously impose a binding obligation on the States," meaning that "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341.

### b. Analysis

Both parties rely heavily on conflicting out-of-circuit district court opinions to support their positions regarding whether the regulations at issue create a federal right and, in turn, an actionable § 1983 claim. Plaintiffs rely on *Thrower v. Pennsylvania*. 873 F. Supp. 2d 651 (W.D. Pa. 2012) (holding that § 1396a(a)(31) creates a federal right actionable under § 1983). Defendants rely on *JL v. New Mexico Dept. of Health*. 165 F. Supp. 3d 1048 (D.N.M. 2016) (holding that § 1396a(a)(31) does not create a federal right actionable under § 1983). The Ninth Circuit has not considered the question. This Court cannot find any district court decision within the Ninth Circuit that has addressed the question either. Accordingly, the Court will conduct its own analysis of the *Blessing* test to resolve the issue.

The Court begins with the text of the statute itself. Section 1396a(a)(31) provides:

A State plan for medical assistance must [] with respect to services in an intermediate care facility for the mentally retarded (where the State plan includes medical assistance for such services) provide, with respect to each patient receiving such services, for a written plan of care, prior to admission to or authorization of benefits in such facility, in accordance with regulations of the Secretary, and for a regular program of independent professional review (including medical evaluation) which shall periodically review his need for such services.

As outlined above, the first prong of the *Blessing* test requires a court to consider whether congress intended for the statute to confer a federal right that can support a cause of action under § 1983. Congress creates a federal right when a statute's text is "phrased in terms of the persons benefited," with "rights-creating terms."[5] *Gonzaga U.,* 536 U.S. at 274. Defendants argue that § 1396a(a)(31) is not "phrased in terms of the persons benefited" because it is directed towards the state as a condition to receive funding: "it is evident that Section 1396a(a)(31) is for the benefit of the government . . . the statute addresses the requirement that services and programs are in fact needed for a recipient for the purpose of funding." Dkt. 58-1, at 8. But the fact that the provision outlines conditional requirements to the state for the receipt of funding does not resolve the issue.

In fact, the Ninth Circuit has recently clarified the application of the *Blessing* test with respect to conditional provisions of the Medicaid Act and rejected the notion that a provision cannot create federal rights when phrased as a directive to the state. *See Anderson v. Ghaly,* 930 F.3d 1066, 1074 (9th Cir. 2019) ("Two cases in which we concluded that

---

[5]The "rights-creating terms" need not explicitly use the word "rights." For example, 42 U.S.C. § 1396a(a)(10), which the Ninth Circuit held does create a federal right actionable under § 1983, does not contain the word "right." *See Watson v. Weeks*, 436 F.3d 1152 (9th Cir. 2006).

certain provisions of the Medicaid Act created rights enforceable under § 1983 confirm that the district court's dichotomy—between the creation of individual rights in a Spending Clause statute and directives to the states seeking to qualify for funding—is a false one.") (cleaned up). The *Anderson* court noted that the conditional nature of Medicaid programs ensures that the "statutes enacting them will nearly always be phrased with a partial focus on the state," but that, nonetheless, if such a statute "specifies that the state must accord enunciated rights to the program's beneficiaries," those rights are enforceable under §1983. *Id.*

Here, the conclusion that § 1396a(a)(31) is phrased "in terms of the persons benefited" (the patients at an intermediate care facility) is consistent with a plain reading of the provision. Despite being a conditional requirement directed towards the state, the provision repeatedly references individual patients and what the state must do for them. It calls for a written plan of care "with respect to each patient" and requires that an independent professional review "his" need for services. And clearly the ultimate beneficiary of a written plan of care and of independent professional review is the patient himself, any benefit to the states notwithstanding. Thus, § 1396a(a)(31) is "phrased in terms of the persons benefitted," despite being a conditional provision.

With that in mind, the Court must next determine whether § 1396a(a)(31) also includes the "rights-creating terms" necessary to sustain the first prong of the *Blessing* test. Defendants cite *Watson v. Weeks*, 436 F.3d 1152 (9th Cir. 2006), to advance the argument that "[l]ike Section 1396a(a)(17) . . . section 1396a(a)(31) is a general requirement that the state implement a plan of care and medical review for discretionary services rendered; but

it does not confer those rights for such a plan of care and medical review onto the patients/clients." Dkt. 58-1, at 8. This argument, however, is inconsistent with the Ninth Circuit's holdings in both *Anderson* and *Watson.* Indeed, § 1396a(a)(17)[6], which the *Watson* court found does not confer rights, is not the only provision of the Medicaid Act that the *Watson* court considered. That court also examined § 1396a(a)(10)[7] and found that particular provision *did* include the requisite rights-creating terms and *could* sustain a § 1983 claim. The Ninth Circuit's reasoning with respect to § 1396a(a)(10) is more applicable to the statue at issue here than its reasoning with respect to § 1396a(a)(17).

In its discussion on the creation of § 1983 rights, the *Watson* court advanced several key considerations. Critically, the *Watson* court noted that when a Medicaid Act provision requires a state to provide a particular benefit or service to a specified category of individuals, there is "a presumption in favor of a § 1983 right under *Blessing*." *Watson*, 436 F.3d at 1161. However, in order "[t]o create enforceable rights, the statutory provision in question must focus on individual rights to benefits, rather than only the aggregate or systemwide policies and practices of a regulated entity." *Id.* at 1159. Indeed, in holding that § 1396a(a)(10) creates rights redressable under § 1983, the Ninth Circuit noted that it was "[s]ignificant[], [that] the provision is phrased in terms of the individuals benefited." *Id.* at 1160.

---

[6] Section 1396a(a)(17) outlines that a state plan for medical assistance must contain reasonable general standards for determining eligibility and the extent of medical assistance under the plan.

[7] "According to section 1396a(a)(10), a state plan for medical assistance must provide "for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5) . . . of section 1396d(a) of this title," to "all individuals" meeting specified financial eligibility standards. 42 U.S.C. § 1396a(a)(10)." *Watson,* 436 F.3d at 1159.

To illustrate the point, the *Watson* court compared § 1396a(a)(10) to § 1396a(a)(5), a provision of the Medicaid Act which the Ninth Circuit has held does not create a § 1983 right.[8] *See Id.* at 1161. That provision, which does not mention individual patients or beneficiaries, merely created a broad and structural administrative requirement. In contrast, the *Watson* court found that "[t]he wording of § 1396a(a)(10) is sharply different [from that of § 1396a(a)(5)]: Congress used 'all individuals' [in § 1396a(a)(10)] as a focal term and established entitlements to specific benefits for individuals." *Id.* This distinction, between provisions that impose obligations on states to perform tasks or services with respect to individuals, and provisions that impose generally structural or administerial obligations, is at the heart of the *Watson* court's conclusion that § 1396a(a)(10) creates a § 1983 right.

Here, Defendants would have the Court construe § 1396a(a)(31) like those generally structural provisions discussed in *Watson* that are not framed in terms of benefits or duties to individuals. It seems, however, that § 1396a(a)(31) aligns more closely with § 1396a(a)(10) and thus is entitled to a "presumption of a section 1983 right under *Blessing*."

---

[8] Section 1396a(a)(5) states that:

> A State plan for medical assistance must either provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan; or provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan, except that the determination of eligibility for medical assistance under the plan shall be made by the State or local agency administering the State plan approved under subchapter I or XVI (insofar as it relates to the aged) if the State is eligible to participate in the State plan program established under subchapter XVI, or by the agency or agencies administering the supplemental security income program established under subchapter XVI or the State plan approved under part A of subchapter IV if the State is not eligible to participate in the State plan program established under subchapter XVI.

*Id*. Like § 1396a(a)(10), which provides that medical assistance must be made available to "all individuals," § 1396a(a)(31) provides that the state must provide a written plan of care to "each patient" and have an independent professional periodically review "his" need for the services provided at the intermediate care facility. This language requires the state to provide a particular benefit or service to a specified category of individuals. Therefore, the statute does include "rights-creating terms," and Plaintiffs § 1983 claims survive the first prong of the *Blessing test.*

The second prong of the *Blessing* test requires that "the plaintiff . . . demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." 520 U.S. at 340–41 (quoting *Wright*, 479 U.S. at 431, 107 S. Ct. 766). At face value, the right to a written plan of care and independent periodic review meets that requirement. These are not subjective or amorphous concepts; they are objective requirements that unequivocally define a state's obligations and a patient's rights.

Moreover, because the statue itself created the federal rights at issue here, the court may consider the implementing regulations to clarify the scope and specifications of those rights. *See Save Our Valley*, 335 F.3d at 943 ("As an agency interpretation of a statute, a regulation may be relevant in determining the scope of the right conferred by Congress. Agency regulations therefore may be considered in applying the three-prong *Blessing* test." (internal citations omitted)). With the added guidance of the implementing regulations, the

requirements set forth in § 1396a(a)(31) are abundantly clear.[9] Plaintiffs' § 1983 claim survives the second prong of the *Blessing* test.

The third prong of the *Blessing* test requires that the statute "unambiguously impose a binding obligation on the States." *Blessing*, 520 U.S. 329 at 341. This prong is clearly satisfied as the provision unambiguously imposes binding obligations on the state, speaking unequivocally in terms of what the facilities "must" do. As such, Plaintiffs have satisfied their burden of establishing that the statutory provision in question creates federally enforceable rights through § 1983. In sum, the Court finds that, under *Blessing*, § 1396a(a)(31) creates a federal right that is actionable under § 1983. The Court turns next to Defendants substantive arguments in opposition to Counts IV-VII.

### 2. *Rule 12(b)(6) Challenges*

#### a.  <u>Introduction</u>

Defendants next argue that even if § 1396a(a)(31) can sustain a § 1983 cause of action, Counts IV through VII should be dismissed against Defendants King, Gushwa, Combs, and Luper because the Amended Complaint fails to plead facts sufficient to state a claim for relief. Dkt. 58-1, at 9–11. Joining Defendants Miller, Edwards, Tompkins and Berg advance the same argument. Dkt 59, at 4–5. Defendants contend that the Second Amended Complaint fails to allege any facts that put the individual capacity Defendants on notice of how they violated § 1396a(a)(31), which, as discussed above, requires that

---

[9] The Court acknowledges Defendants' argument that "[t]hese regulations are broad and go far beyond what Congress provided when it enacted Section 1396a(a)(31). For example, in Count IV of the Complaint, Plaintiffs allege Defendants acted wrongfully by violating 42 C.F.R. §483.420, which has absolutely no correlation to Congress's mandate in Section 1396a(a)(31)." Dkt. 62. This contention is discussed at length below.

facilities receiving Medicaid funding must provide a "written plan of care . . . in accordance with regulations of the Secretary" and a "regular program of independent professional review." Dkt. 58-1, at 10. Defendants also argue that the statute places an obligation on the facility, and that it is, therefore, "difficult to imagine how employees, in their individual capacities, could violate such a rule." *Id.* Defendants thus conclude that counts IV-VII should be dismissed pursuant to Rule 12(b)(6).

Plaintiffs frame the matter differently. With a focus on the statute's implementing regulations, their briefing cites a plethora of instances of abuse and neglect alleged in the Second Amended Complaint. Dkt. 61, at 7–9. These acts and omissions, they argue, violated various provisions of C.F.R. §§ 483.420, 483.430, 483.440, and 483.450, which—as the implementing regulations to § 1396a(a)(31)—in turn violated the federal rights secured in that statute. *Id*.

b. Discussion

As a threshold matter, the Court acknowledges that, if taken as true, the allegations in the Second Amended Complaint establish, at the very least, that some Defendants violated various *provisions* of the regulations cited in Counts IV-VII. For example, C.F.R. § 483.420 provides, among other things, that the facility must "[e]nsure that clients are not subjected to physical, verbal, sexual or psychological abuse or punishment." 42 C.F.R. § 483.420. However, the Amended Complaint does not as clearly allege facts that show that the moving Defendants, all of whom appear to be non-supervisory employees at SWITC, directly violated patients' rights to a "written plan of care" and a "regular program of independent professional review" as set forth in § 1396a(a)(31). This discrepancy arises

because many rules enumerated in C.F.R. §§ 483.420–483.450 are beyond the dimensions of the relatively narrow rights conferred by the statute. Accordingly, the relationship between § 1396a(a)(31) and C.F.R. §§ 483.420–483.450 is somewhat convoluted. Some provisions in those regulations do implement § 1396a(a)(31). Others do not.[10] Thus, the issue here turns, in large part, upon which provisions in C.F.R. §§ 483.420–483.450 are rules that merely explicate and further define the rights set forth in 42 U.S.C. § 1396a(a)(31)—and, therefore, carry the weight of those rights—and which provisions lay beyond the scope of the statutorily created rights and, therefore, cannot sustain a § 1983 right of action.

Additionally, it is not entirely clear that it is possible for an individual employee to violate some of the relevant provisions in an individual capacity. Many of the implementing regulations appear to bind only the facilities themselves. Although true that SWITC can only act through its employees, it seems unreasonable to hold low-level, non-managerial employees individually responsible for the facility's failure to abide by requirements explicitly directed towards the state or facility itself. Of course, "[p]ublic servants may be sued under section 1983 in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). But that does not necessarily resolve the issue presented here. The violation must be of the

---

[10] Of course, all of the regulations cited in counts IV-VII are implementing regulations for the administration of intermediate care facilities generally. Indeed, C.F.R. 483.400 provides that "this subpart implements section 1905 (c) and (d) of the Act which gives the Secretary authority to prescribe regulations for intermediate care facility services in facilities for individuals with intellectual disabilities or persons with related conditions." However, Plaintiffs provide § 1396a(a)(31) specifically as the basis for their § 1983 claims.

sort that the employee is actually capable of committing as an individual. An institution's wrongdoing cannot necessarily be imputed to low-level employees.

So, the outcome here depends, to varying degrees, upon (1) whether the regulatory provisions that Plaintiffs rely on fall within the scope of § 1396a(a)(31) and the rights created therein; (2) whether it is possible for an individual employee, as opposed to the facility or state itself, to violate those provisions; and (3) if so, whether the moving Defendants did violate those provisions.[11]

Before turning to those questions, reviewing the relationship between a statute and its implementing regulations in the context of the *Blessing* test may prove useful. While discussing the role that regulations can play in explicating—but not creating—federal rights, the Ninth Circuit has said that "so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—'*in conjunction with the regulation*'—may create a federal right as further defined by the regulation." *Save Our Valley*, 335 F.3d at 941 (quoting *Harris v. James*, 127 F.3d 993 at 1009 (11th Cir.1997) (emphasis added).[12]

---

[11] Plaintiffs also cite to Idaho Code §§ 16.03.11.004.05—16.03.11.004.08. These regulations merely incorporate their federal counterparts.

[12] The Second Circuit has articulated the application of these principles nicely:

> It is well-settled that, as an agency interpretation of a statute, a regulation may be relevant in determining the scope of the right conferred by Congress. The following rubric guides our inquiry in that regard: So long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—in conjunction with the regulation—may create a federal right as further defined by the regulation. On the other hand, if the regulation defines the content of a statutory provision that creates no federal right, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, the regulation is too far removed from Congressional intent to constitute a

(cont.)

Some provisions in C.F.R. §§ 483.420–483.450 admittedly do more than flesh out the rights created by § 1396a(a)(31). Some involve matters that reach well beyond the rights prescribed by § 1396a(a)(31). As discussed, those regulatory provisions cannot sustain a § 1983 action without underlying statutory authority. And here, the only underlying statutory authority presented is § 1396a(a)(31).[13]

Still, many provisions in C.F.R. §§ 483.420–483.450 do operate within the boundaries established by the right to a "written plan of care." For example, subsection (c)(6)(i) of C.F.R. § 483.440 provides that "[t]he individual program plan must also describe relevant interventions to support the individual toward independence." Assuming that "individual program plan" is synonymous with "written plan of care," as the Court does at this early stage, this provision is one that explicates—and does not stray from—the right Congress conveyed in § 1396a(a)(31).[14] It fleshes out the content of the right and, therefore, carries the weight of authority conferred by the right.

Counts IV-VII each correspond to one section of C.F.R. §§ 483.420–483.450. The Court will consider each Count—and, therefore, each regulation—individually to determine: (1) whether it contains provisions that implement § 1396a(a)(31); (2) whether

---

"federal right" enforceable under § 1983.

*Shakhnes v. Berlin*, 689 F.3d 244, 251 (2d Cir. 2012) (cleaned up).

[13] Plaintiffs also rely on 42 U.S.C. §1396d(d), but as discussed, § 1396d(d) does not confer any rights. *Supra* note 3.

[14] The Court's assumption is reinforced by the observation that the entire subpart of the Code of Federal Regulations that implements intermediate care facility policy does not ever use the phrase "written plan of care." It does, however, repeatedly refer to "individual program plan."

it is possible for individual employees to violate the relevant provisions; and (3) whether the moving Defendants did violate those provisions. Because C.F.R. § 483.430, the basis for Count V, sheds considerable light on how the other regulations interact with § 1396a(a)(31), the Court will consider it first.

(i)      Count V – 42 C.F.R. § 483.430

42 C.F.R. § 483.430, entitled "Condition of participation: Facility staffing," is the basis of Count V. As with all of the regulations cited in counts IV-VII, Plaintiffs rely on § 1396a(a)(31) as the underlying statutory authority. Plaintiffs argue, correctly, that 42 C.F.R. § 483.430 imposes obligations upon SWITC to ensure that each SWITC client's active treatment program is integrated, coordinated, and monitored by qualified professionals; that SWITC utilizes responsible direct care staff that are able to take prompt and appropriate action at all times; that sufficient direct care staff are on duty consistent with required staff-to-client ratios; and that staff receive appropriate and continuing training that allows each staff person to perform their duties effectively, efficiently, and competently. Dkt. 50, at 11–12. Defendants argue that despite the obligations that 42 C.F.R. § 483.430 imposes on SWITC, the Second Amended Complaint does not put the individual capacity Defendants on notice of how they violated Plaintiffs' right to a "written plan of care" and a "regular program of independent professional review." Dkt. 58-1, at 10. Moreover, Defendants argue that it is impossible for the individual capacity Defendants to violate the regulations because they are directed towards the state, not individuals. *Id.* At this juncture, the Court agrees that the Plaintiffs have pled "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

First, many provisions of 42 C.F.R. § 483.430 do fall within the scope of the rights conferred by § 1396a(a)(31). The regulation does not mention "independent professional review." It does, however, contain provisions that fall squarely within the sphere of each client's right to an individualized "written plan of care." In fact, the regulation references "individual program plan" five times. Significantly, and the reason that the Court considered Count V before Count IV, the regulation provides that "[e]ach client must receive the professional program services needed to implement the active treatment program defined by each client's individual program plan." 42 C.F.R. § 483.430.

Thus, it appears that in the regulatory scheme, the "professional program services" are the methods through which the individualized "written plan of care" or "individual program plan" is put into action. As such, it follows that regulatory rules that relate to clients' "professional program services," also fall within the scope of the right to a "written plan of care"—a right conferred by Congress that can be redressed under § 1983. A contrary inference would lead to the conclusion that Congress conferred on patients the right to receive a "written plan of care," but not the right to have that plan properly implemented and followed. The Court rejects that proposition.

Still, the question remains whether the facility itself, or also the individual Defendants, can violate 42 C.F.R. § 483.430. The regulation is rife with provisions, many of which SWITC appears to have violated, that clearly obligate the facility to adequately staff and train employees in order to implement each client's individualized plan of care. For example, subsection (b)(2) provides that "[t]he facility must have available enough qualified professional staff to carry out and monitor the various professional interventions

in accordance with the stated goals and objectives of every individual program plan." 42 C.F.R. § 483.430. This type of provision clearly is directed at the facility itself, as opposed to any individual person.

Nonetheless, the claims brought here are against the individual capacity Defendants, with the exception of Ms. Newton, who is being sued in her official capacity. As Defendants point out, and the Court agrees, it makes little sense to hold non-supervisory employees responsible for violating provisions that are targeted towards SWITC itself. Most of the provisions in this regulation fall into that category. However, there are provisions in 42 C.F.R. § 483.430 that expressly apply to individual staff members.[15] For example, subsection (e)(4) mandates that "[s]taff must be able to demonstrate the skills and techniques necessary to implement the individual program plans for each client for whom they are responsible." Likewise, subsection (b)(3) says that "[p]rofessional program staff must participate as members of the interdisciplinary team in relevant aspects of the active treatment process." Thus, at this early stage, the Court finds that it is plausible for an individual employee to violate some provisions of 42 C.F.R. § 483.430.

Finally, the abuse, neglect, and mistreatment alleged in the Second Amended Complaint against the individual Capacity Defendants are sufficient to sustain a plausible claim under § 1396a(a)(31) and 42 C.F.R. § 483.430. Discovery will reveal which individual Defendants are subject to the "professional program staff" provisions and which

---

[15] The regulation delineates between "professional program staff" and "direct care staff." It imposes different obligations on both. Direct care staff are defined as "the present on-duty staff calculated over all shifts in a 24–hour period for each defined residential living unit." 42 C.F.R. § 483.430(d)(2). At this stage of the proceeding, it is not clear which category each individual Defendant belongs to.

are subject to the "direct care staff" provisions. But at this juncture, it seems as though the allegations against all of the individual Defendants could plausibly amount to a failure "to demonstrate the skills and techniques necessary to implement the individual program plans."[16] Defendants' Motions to Dismiss Claim V is, therefore, DENIED.

     *(ii)*     *Count IV – 42 C.F.R. § 483.420*

Count IV of the Second Amended Complaint is similar in form and substance to Count V, except that it relies on 42 C.F.R. § 483.420. Entitled "Conditions of Participation: Client Protections," 42 C.F.R. § 483.420 contains provisions aimed at promoting communication with clients' families; developing polices that prohibit mistreatment; and prohibiting staff from using physical, verbal, sexual, or psychological punishment or abuse.

It is clear from the Second Amended Complaint that many individual capacity Defendants may have violated at least some provisions of 42 C.F.R. § 483.420. For example, subsection (d)(1)(i), provides that "[s]taff of the facility must not use physical, verbal, sexual or psychological abuse or punishment." And a plain reading of this subsection indicates that it is a mandate directed towards staff members.

It is less clear whether the relevant provisions of 42 C.F.R. § 483.420 derive their authority from the clients' right to a "written plan of care" or from the "regular program of independent professional review." Unlike 42 C.F.R. § 483.430, this regulation discusses individualized "written plans of care" only vaguely. Subsection (a)(10) provides that the facility must "[e]nsure that clients have access to telephones . . . except as contraindicated

---

[16] If, after discovery, it appears that any or all of the individual Defendants did not violate the relevant provisions, summary judgement will be straightforward with respect to those Defendants on these claims.

by factors identified within their *individual program plans*," and section (d)(1)(i) provides that the facility shall "develop and implement written policies and procedures that prohibit mistreatment, neglect or abuse of the client." C.F.R. §483.420 (emphasis added).

Again, the Court assumes, at this stage, that an "individual program plan" is synonymous with a "written plan of care." However, a passing allusion to an individual program plan, in the extremely narrow context of subsection (a)(10) of the regulation, does not serve as a hook to bring the entire regulation within the purview of § 1396a(a)(31). And the "written policies and procedures" referred to in subsection (d)(1)(i), which presumably apply to the entire facility, are not synonymous with an individualized "written plan of care."

Still, without the benefit of discovery, the Court cannot say with certainty that the relevant provisions *do not* derive their authority from § 1396a(a)(31). As discussed in relation to Count V, the Court rejects the notion that the right to a "written plan of care" does not also include the right to have that plan properly implemented and enforced. Thus, the question of whether the relevant provisions, particularly subsection (d)(1)(i), carry the weight of the right to a "written plan of care" depends upon what the actual "written plan of care" says. If using physical, verbal, sexual or psychological abuse or punishment—a violation of subsection (d)(1)(i)—also violates a patient's "written plan of care," then that subsection falls within the purview of § 1396a(a)(31). If, on the other hand, the "written plan of care" does not directly conflict with the use of the methods prohibited in subsection (d)(1)(i), it would appear that the provision is beyond the scope of the statutory right. Because the Court cannot definitively say that the relevant provisions of C.F.R. §483.420

are beyond the scope of the statutory right, Defendants' Motions to Dismiss Count VI is DENIED.

> (iii)    *42 C.F.R. § 483.440 – Count VI*

42 C.F.R. § 483.440, titled "Condition of participation: Active treatment services" clearly implements and explicates § 1396a(a)(31) and the rights embedded therein. For example, subsection (c) of the regulation provides a detailed framework of the requirements for an "individual program plan," subsection (d) outlines the rules for the plan's implementation, subsection (e) discusses the plan's documentation, and subsection (f) describes the process for undergoing the professional review contemplated by § 1396a(a)(31).

Based on the allegations in the Second Amended Complaint, there appears to be at least one provision in 42 C.F.R. § 483.440 that the individual capacity Defendants could— and possibly did—violate. Specifically, subsection (d)(3) provides that "[e]xcept for those facets of the individual program plan that must be implemented only by licensed personnel, each client's individual program plan must be implemented by all staff who work with the client, including professional, paraprofessional and nonprofessional staff." And much like subsection (d)(1)(i) of C.F.R. § 483.420, the Court cannot determine whether the allegations against the individual capacity Defendants constitute violations of the provision without further discovery. It is impossible to know whether the individual Defendants failed to properly implement the individual program plans without knowing what the plans say. At this stage, however, the Court must assume the veracity of Plaintiff's allegations. And again, if discovery does not yield information indicating that the individual

Defendants violated the relevant provisions of C.F.R. § 483.440, the summary judgement phase will be straightforward. For now, however, the Court cannot definitively say that the allegations against the individual Defendants are not violations of C.F.R. § 483.440 and § 1396a(a)(31). As such, Defendants' Motions to Dismiss Count VI is DENIED.

    *(iv) 42 C.F.R. § 483.450 – Count VII*

   Like the regulations discussed above, certain provisions in 42 C.F.R. § 483.450 pertain to intermediate care facility clients' right to an "individual program plan." Subsection (b), entitled "Management of inappropriate client behavior," requires that "[t]he use of systematic interventions to manage inappropriate client behavior must be incorporated into the client's individual program plan, in accordance with § 483.440(c)(4) and (5) of this subpart" and that "[t]echniques to manage inappropriate client behavior must never be used for disciplinary purposes, for the convenience of staff or as a substitute for an active treatment program." And subsection (d), entitled "physical restraints," specifies that "[t]he facility may employ physical restraint only as an integral part of an individual program plan that is intended to lead to less restrictive means of managing and eliminating the behavior for which the restraint is applied . . . ." A substantial enough nexus exists between these provisions and the right to a "written plan of care" or "individual program plan" that these provisions, and others in in 42 C.F.R. § 483.450, fall within the scope of the rights conferred by § 1396a(a)(31) and can be considered part of that statute's implementing regulations.

   Once again, the Court cannot definitively say whether the allegations against the individual moving Defendants constituted violations of the relevant 42 C.F.R. § 483.450

provisions because the Court does not know what each patient's "written plan of care" says. But without further discovery, it cannot definitively answer no. At this stage, Plaintiffs have alleged sufficient facts under a cognizable legal theory to avoid dismissal pursuant to rule 12(b)(6). The Court will not recite the full list of alleged violations against each moving Defendant, but specific acts and omissions are alleged against each individual Defendant such that the individual Defendants are on notice of how they allegedly violated various individual Plaintiff's right to a "written plan of care" and the proper implementation of that plan. Thus, Defendants' Motion to Dismiss Count VII is also DENIED.

**B. Counts VIII & IX – Negligence Per Se**

Counts VIII and IX are Negligence per se claims, brought respectively under two Idaho statutes relating to "vulnerable children" and "vulnerable adults." Both claims are brought against all individual capacity Defendants. Plaintiffs claim that the individual capacity Defendants engaged in abusive or other inhumane behavior and failed to report the same. Idaho Code § 16-1605(1), the basis for Count VIII, requires that any:

> person having reason to believe that a child under the age of eighteen (18) has been abused, abandoned or neglected or who observes the child being subjected to conditions or circumstances that would reasonably result in abuse, abandonment or neglect shall report or cause to be reported within twenty-four (24) hours such conditions or circumstances to the proper law enforcement agency or the department.

Idaho Code § 39-5303(1), the basis for Count IX, requires that any employee of a "state licensed or certified residential facility serving vulnerable adults . . . who has reasonable cause to believe that a vulnerable adult is being or has been abused, neglected or exploited

shall immediately report such information to the commission."

Counts VIII and IX of the Second Amended Complaint correspond to counts X and XI of the First Amended Complaint. Dkt. 7. The Court dismissed those claims on the ground that the claims did not meet the pleading standards of *Iqbal* and *Twombly* because it was "difficult to ascertain the basic who, what, where, when, and why necessary to put Defendants on notice of the claims against them." Dkt. 49, at 15. Plaintiffs revived these claims in the Second Amended Complaint in a slightly different form and with some additional facts. Dkt. 50, at 46–48. Defendants King, Gushwa, Newton, Combs, and Luper again moved to dismiss the claims because Plaintiffs fail to plead enough facts to state a claim for relief. Dkt. 58, at 11–12. Shortly after, Defendants Edwards, Miller, Tompkins, and Berg joined the motion. Dkt. 59, at 5–6.

Defendants argue that, despite the benefit of informal discovery, Plaintiffs again failed to provide the necessary details to put the individual Defendants on notice of the claims against them. Dkt. 58, at 11. Plaintiffs counter that the Defendants refused to produce essential documentation in informal discovery and that the behavior described in the Second Amended Complaint nonetheless provides more than enough evidence to place Defendants on notice under *Iqbal* and *Twombly*. Dkt. 61, at 9–10.

At this juncture the Court wishes to address Defendants' argument that the Second Amended Complaint "contains hardly any new facts or no new facts at all against Defendants Newton, Combs, Luper, King, and Gushwa to remedy the factual deficiencies in the previously filed Complaint for the claims of negligence per se, assault, battery, and intentional infliction of emotional distress." Dkt. 58-1, at 16. This is—to an extent—true.

The factual allegations against some of the individual capacity Defendants are identical to the allegations in the First Amended Complaint.

However, it is important to note that most of the deficiencies in the First Amended Complaint were more organizational than factual in nature. As the Court noted, "to some degree, this is merely a restructuring of the Amended Complaint—organizing the facts and arguments so Defendants can ascertain what Plaintiffs are accusing them of." Dkt. 49, at 17. The First Amended Complaint alleged many facts that likely did support the claims against various individual capacity Defendants, but the organization made it difficult to ascertain which factual allegations corresponded to which claims and against which Defendants.

Plaintiffs have made some effort to cure the structural problems from the First Amended Complaint. However, they still often rely on incorporating all of the facts from the "general allegations" section of the Second Amended Complaint to support some claims against some Defendants.[17] To be sure, Plaintiffs could have been far more explicit in detailing exactly what factual allegations align with which claims. Nonetheless, it appears that they did make an effort to provide at least some insight as to which facts from the "general allegations" section of the Second Amended Complaint constituted each

---

[17] As discussed in the prior order, the principle of incorporation does, of course, allow Plaintiffs to merge allegations in one section of a complaint into any other claim or section. However, the Court also noted that, given the complex nature of this matter, "it would be helpful if Plaintiffs took the time to specify which facts give rise to [] which claims—and vis-à-vis which Plaintiffs and which Defendants." Dkt. 49, at 14 n.7. The Second Amended Complaint has satisfied that request to a degree, although there are still some claims brought against all individual capacity Defendants that do not specify exactly which allegations against which Defendant gives rise to the claims. In the interest of resolving this matter in a timely fashion, the Court was more inclined to search the Second Amended Complaint for the relevant allegations than it was when it reviewed the Motions to Dismiss the First Amended Complaint.

claim. In Count XI of the Second Amended Complaint, for example, Plaintiffs at least specified that "Defendant Burkett physically battered B.B., as more fully described above . . . Defendants Burkett and Gushwa physically battered Michael McNamar, as more fully described herein . . . Defendants Burkett, McGee and Tompkins battered Nickolas Pease, as more fully described herein. . . ." Dkt. 50, at 49-50. And although these statements are in themselves conclusory, the allegations that they reference are not.

So, despite Plaintiffs' failure to fully remedy the structural issues in the First Amended Complaint, the Court notes that they at least attempted to do so, and that there are many accusations in the "general allegations" section of the Second Amended Complaint that likely do establish a basis for many of the claims. As such, the Court is more willing to sift through the "general allegations" section of the Complaint in order to determine if Plaintiffs have pled sufficient facts than it was when it considered the previous Motion to Dismiss.

Because the factual allegations against most individual Defendants differ, the Court will consider the allegations against each Defendant separately to determine whether they are stated with adequate particularity to put that Defendant on notice. And of course, if the Court finds Plaintiffs have not met their burden, but discovery then yields relevant information, Plaintiffs can move to amend their pleadings accordingly.

*1. Defendant Tompkins*

The singular allegation against Defendant Tompkins in the Second Amended Complaint is that he "abused Nick Pease." Dkt. 50, ¶ ¶ 165, 281. This is precisely the type

of generalized, conclusory assertion that does not meet the pleading standards set forth by *Iqbal* and *Twombly.* Defendants' Motion to Dismiss Count VII and IX against Defendant Tompkins is therefore GRANTED.

   *2. Defendant Berg*

   The Second Amended Complaint alleges that Defendant Berg watched and observed as Defendant Jason Miller "slammed Nathan [Benjamin's] nose into a counter causing injury and bleeding and threw him into a chair," yet she did not offer assistance or intervene. Dkt. 50, ¶ 172. The Complaint also asserts that Defendant Berg "allowed Nathan [Benjamin] to engage in kissing with other residents without intervening to terminate such conduct." Dkt. 50, ¶ 182.

   These accusations are adequate to put Defendant Berg on notice of how she allegedly violated Idaho Code. The allegations specify who abused whom, and how. Again, all that is needed to survive at this stage is "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Twombly*, 550 U.S. at 554. Those elements are satisfied here. According to the accusations, Defendant Berg observed Plaintiff Benjamin being abused by Defendant Miller. She was statutorily obligated to report that abuse.

   It appears that Nathan was over eighteen at the relevant times. Therefore, Defendants' Motion to Dismiss Count IX against Defendant Berg is DENIED. Because Idaho Code § 16-1605(1) only applies to persons under the age of eighteen, the Motion to Dismiss Count VIII against Defendant Berg is GRANTED.

### 3. Defendant King

The allegations against Defendant King are identical to those against Defendant Berg, except in that Defendant King is not mentioned in paragraph 182. As such, the analysis with respect to paragraph 172 is the same, and Defendants' Motion to Dismiss Count IX with respect to Defendant King is DENIED. Because Nathan appears to have been over eighteen at all relevant times, the Motion to Dismiss Count VIII with respect to Defendant King is GRANTED.

### 4. Defendant Edwards

The Second Amended Complaint brings two accusations against Defendant Edwards. Paragraph 264 alleges that "Edwards . . . failed to properly report the maltreatment of certain Plaintiffs and Class Members, including B.B. and Colby, about which such Defendants knew or should have known. This failure to report constituted violations by Defendants of Section 16-1605." Dkt. 50, ¶ 264. This allegation, which does not identify what abuses Edwards saw or who committed them, fails to meet the pleading standards set forth by *Iqbal* and *Twombly*.

However, Plaintiffs also allege that "Edwards has been observed attacking Colby [Bloom] for over 20 minutes at a time when he was a minor . . . . This abuse was not reported as abuse to a vulnerable child or, upon information and belief, investigated. Colby suffered a black eye from this beating . . . ." *Id.* at ¶ 186. This allegation provides enough detail to put Edwards on notice of how he violated Idaho Code § 16-1605(1). It specifies the manner of abuse (beating), the victim (Colby Bloom), and the alleged preparator (Edwards himself).

The accusations specify that Colby was a minor at the time of the incident. As such, Defendants' Motion to Dismiss Count VIII with respect to Defendant Edwards is DENIED and Defendant's Motion to Dismiss Count IX with respect to Defendant Edwards is GRANTED.

### 5. Defendant Gushwa

Plaintiffs allege that Defendant Gushwa "would make Michael [McNamar] work for his medications, and took Michael's stuffed animal, tearing it in the seams and inflicting psychological abuse as a result," and that he "has grabbed Michael's kneecap with continued severe force as to cause injury requiring medical treatment." Dkt. 50, ¶¶ 138-139. Like the allegation in paragraph 186 against Defendant Edwards, these allegations specify what abuse occurred, who committed it, and who the victim was. Again, this is sufficient to put the Defendant on notice of how he violated the relevant statutes.

The pleadings do not make Michael's age at the time of the abuse entirely clear. The Court tentatively infers that Michael was under eighteen at the time. As such, Defendants' Motion to Dismiss Count VIII with respect to Defendant Gushwa is DENIED and Defendant's Motion to Dismiss Count IX with respect to Defendant Gushwa is GRANTED. If it turns out that the Courts inference as to Michael's age is incorrect, the Motion to Dismiss with respect to Count VIII will be granted and the Motion to Dismiss with respect to Count IX will be denied.

### 6. Defendant Miller

The allegations against Defendant Miller are that he "slammed Nathan's nose into

a counter causing injury and bleeding and threw him into a chair . . ." (Dkt. 50, ¶ 172), and that he "engaged in psychological abuse against Nathan, including threatening to 'kick [his] f\*\*king a\*\*,' and name calling, including 'f\*\*kface.'" Dkt. 50, ¶ 173. These accusations are, once again, sufficient to put the Defendant on notice of how he allegedly violated Idaho Code. They specify who abused whom, and how. Therefore, Defendants' Motion to Dismiss Count IX with respect to Defendant Miller is DENIED. Because Idaho Code § 16-1605(1) only applies to persons under the age of eighteen, the Motion to Dismiss Count VIII with respect to Defendant Miller is GRANTED.

### 7. *Defendant Newton*

As the administrative director at SWITC, the allegations against Defendant Newton are more numerous and wider ranging than those against most of the individual capacity Defendants. Some of the allegations are unrelated to Counts VIII and IX. However, several include instances of abuse and neglect that Defendant Newton was allegedly aware of, and thus statutorily obligated to report. For example, the Second Amended Complaint contends that "Defendant Burkett abused Nathan by using unapproved physical restraints on Nathan, which was observed and approved by Defendant Newton who praised Defendant Burkett's conduct." Dkt. 50, ¶ 181. Similarly, paragraph 108 alleges that "Newton allowed temporary SWITC staff to work with B.B. without being properly trained to manage B.B.'s behaviors, and allowed staff to work with B.B. without appropriate equipment, including pads." Dkt. 50, ¶ 108. These allegations include adequate specificity to meet the pleading standards. The Motion to Dismiss Counts VIII and IX with respect to Defendant Newton is DENIED.

8. *Defendants Luper and Combs*

The allegations against Defendants Luper and Combs both appear in paragraph 126

of the Second Amended Complaint, which provides that:

> Drew [Rinehart] died after Defendants Luper and Combs, and other unknown
> SWITC staff left him unattended, unobserved and neglected in bed for over
> 6 hours, despite a requirement for observation checks every 30 minutes, log
> sheets showing observation checks had actually been conducted on the half
> hour, and that he had been administered medication at 8:00 a.m., when in fact
> he had not been observed during such time or provided such medication.
> Defendant Jamie Newton, and other unknown SWITC staff, enforced and
> had knowledge of a pattern and practice at SWITC that the observation log
> sheets are not accurate and boxes are checked even though actual client
> checks were not performed. Defendant Combs performed an observation
> check at 4:17 a.m., and then Drew was not checked until 10:18 a.m. by
> Defendant Luper. SWITC employee Sadee Jones performed an observation
> check at 10:40. SWITC staff did not discover something was wrong until
> Defendant Luper finally discovered him at 11:29 a.m., when she actually
> went into his room and tried to wake him.

Dkt. 50, ¶ 126. This paragraph provides adequate notice of how Luper and Combs violated

Idaho Code and meets the pleading requirements under *Iqbal* and *Twombly.* Drew Rinehart

was 27 at the time of his death. Therefore, Defendants' Motion to Dismiss Count IX with

respect to Defendants Luper and Combs is DENIED and the Motion to Dismiss Count VIII

with respect to Defendants Luper and Combs is GRANTED.

9. *Summary of Counts VIII and IX*

To summarize the foregoing section, the Motion to Dismiss Count VIII is

GRANTED with respect to Defendants Berg, Tompkins, Miller, Luper, Combs, and King.

It is DENIED with respect to Defendants Gushwa, Newton, and Edwards. The Motion to

Dismiss Count IX is GRANTED with respect to Defendants Gushwa, Edwards, and

Tompkins. It is DENIED with respect to Defendants King, Newton, Combs, Luper, Miller,

and Berg. To reiterate, Plaintiffs may move to amend their pleadings as discovery yields new information—particularly about any individual Plaintiffs' age at the time of the events in question.

### C. Count X - Assault

Count X of the Second Amended Complaint, entitled "Assault" and brought against all individual capacity Defendants, asserts that "[w]ithout consent or privilege, by an intentional act directed at Plaintiffs and Class Members . . . Defendants' including Defendant Burkett caused Plaintiffs and Class Members . . . apprehension or fear of immediate harm or offensive contact through the excessive and repeated use of coercion, threats, abuse, intimidation and neglect." Dkt. 50, ¶ 275. Defendants moved to dismiss this claim against Defendants King, Newton, Combs, Luper, Miller, Edwards, Tompkins, and Berg because Plaintiffs have failed to allege facts sufficient to plead assault against them.

"Assault is an unlawful threat or offer to do bodily harm or injury to another." *Miller v. Idaho State Patrol*, 252 P.3d 1274, 1289 (Idaho 2011) (cleaned up). Idaho Civil Jury Instruction 4.30 properly states the elements of civil assault as follows:

> The plaintiff has the burden of proving each of the following propositions:
> 1. The defendant acted intending to cause harmful or offensive contact with the person of the plaintiff or a third person, or an immediate fear of such contact; and
> 2. As a result, the plaintiff feared that such contact was imminent.

Although the Plaintiffs partially failed to comply with the Court's request to clarify the pleadings by "specify[ing] which facts give rise to [] which claims—and vis-à-vis which Plaintiffs and which Defendants" (Dkt. 49, at 14 n.7), there are allegations in the Second Amended Complaint that adequately plead the elements of assault against some

Defendants. Because the majority of the specific allegations against each moving Defendant are outlined in some detail above, the Court will assess the adequacy of the pleadings with respect to Count X more summarily than the previous counts.

There are no allegations in the Second Amended Complaint that adequately allege that Defendants King, Newton, Combs, Luper, Tompkins, or Berg assaulted any of the Plaintiffs. Simply put, the pleadings lack any facts indicating that these Defendants "acted intending to cause harmful or offensive contact with the person of the plaintiff or a third person, or an immediate fear of such contact." Idaho Civil Jury Instruction 4.30. As such, the Defendants' Motion to Dismiss Count X is GRANTED with respect to these Defendants.

The same, however, cannot be said for Defendants Edwards and Miller. The Second Amended Complaint alleges that Defendant Edwards "attack[ed] Colby for over 20 minutes," (Dkt. 50, ¶ 186) and Defendant Miller "slammed Nathan's nose into a counter causing injury and bleeding and threw him into a chair," and "threaten[ed] 'to kick [Nathan's] f**king a** . . . .'" Dkt. 50, ¶¶ 172, 173. These allegations sufficiently allege that Defendants "acted intending to cause harmful or offensive contact with the person of the plaintiff . . . ." Idaho Civil Jury Instruction 4.30. The Court acknowledges that the Second Amended Complaint does not explicitly allege that these particular incidents caused the Plaintiffs fear that "such contact was imminent." *Id*. However, one can scarcely imagine how the alleged conduct possibly wouldn't illicit that fear. If, after discovery, it turns out that the second element of an assault claim is somehow absent here, summary judgement will be straightforward. Therefore, Defendant's Motion to Dismiss Count X is

DENIED with respect to Defendants Edwards and Miller.

### D. Count XI - Battery

Count XI alleges that all of the individual capacity Defendants battered various Plaintiffs. Yet again, the Second Amended Complaint alleges enough facts to survive a Rule 12(b)(6) motion to dismiss this Count with respect to some, but not all, Defendants. However, Defendants move to dismiss this claim against only Defendants King, Newton, Combs, Luper, and Berg. They concede that there are sufficient allegations of battery against Defendants Gushwa, Miller, Tompkins, and Edwards.

"Civil battery consists of an intentional, unpermitted contact upon the person of another which is either unlawful, harmful or offensive." *Neal v. Neal*, 873 P.2d 871, 876 (Idaho 1994) (citation omitted). Much like the section on assault, there are no allegations in the Second Amended Complaint that adequately allege that Defendants King, Newton, Combs, Luper, or Berg battered any of the Plaintiffs. Accordingly, the Defendant's Motion to Dismiss Count XI against Defendants King, Newton, Combs, Luper, and Berg is GRANTED.

### E. Count XIII – Intentional Infliction of Emotional Distress

Count XIII is an intentional infliction of emotional distress claim brought against all individual capacity Defendants. Defendants move to have this claim dismissed against Defendants King, Newton, Luper, Combs, Edwards, Tompkins, and Berg. In order to establish a claim of intentional infliction of emotional distress, the plaintiff must prove: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) there was a causal connection between the defendant's

wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe." *James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2016). The Court examined the "general allegations" section of the Second Amended Complaint to determine whether it included facts that could plausibly sustain an intentional infliction of emotional distress claim against the moving Defendants.

For Defendants King, Luper, Combs, Tompkins, and Berg, the answer to that inquiry, at this juncture, appears to be "no." The allegations against those Defendants are either too vague to meet the *Iqbal* and *Twombly* pleading standards or relate more to negligence and failures to report abusive behavior than to conduct that intentionally caused emotional distress. The allegations against Defendant Edwards and Newton, however, can plausibly sustain an intentional infliction of emotional distress claim.

Defendant Edwards allegedly attacked a patient "for over 20 minutes." Dkt. 50, ¶ 186. Likewise, the allegations against Defendant Newton indicate that her conduct as an administrator at SWITC plausibly created a culture and atmosphere at the facility that was emotionally distressing for a number of Plaintiffs. It is not for the Court to decide at this stage whether any plaintiff actually suffered severe emotional distress. As such, Defendants Motions to Dismiss Count XIII is GRANTED with respect to Defendants King, Luper, Combs, Tompkins, and Berg, and DENIED with respect to Defendants Edwards and Newton.

### F.  Count XV - Injunctive Relief

Count XV, entitled "Injunctive Relief" is brought against all Defendants and asserts that "SWITC residents will be subjected to the same harm as Plaintiffs and Class Members

and will be deprived of their rights, privileges, or immunities secured and protected by federal and state law unless enjoined through temporary and permanent injunctive relief." Dkt. 50, at 53–4. Defendants urge that injunctive relief is inappropriate in the context of a § 1983 claim brought against individual capacity defendants.

It appears that the Ninth Circuit has not yet addressed the issue. However, the Second, Seventh, and Tenth Circuits have held that, in the context of a § 1983 claim, a plaintiff may not obtain equitable relief from a defendant sued in an individual capacity. *See Greenawalt v. Indiana Dept. of Corrections,* 397 F.3d 587, 589 (7th Cir. 2005) (holding that "section 1983 does not permit injunctive relief against state officials sued in their individual as distinct from their official capacity."); *Greenawalt v. Indiana Dept. of Corrections*, 397 F.3d 587, 589 (7th Cir. 2005); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993). Several district courts within the Ninth Circuit have held the same. *See Allen v. Asuncion*, CV 17-06381-AB (RAO), 2018 WL 5858446, at *2 (C.D. Cal. June 19, 2018); *Novin v. Fong*, 14-CV-1218-LHK, 2014 WL 6956923, at *13 (N.D. Cal. Dec. 8, 2014).

The Court sees no reason to depart from those holdings here. And as Plaintiffs cannot obtain injunctive relief in an individual capacity suit under § 1983, the Court GRANTS the Defendants' Motion to Dismiss the injunctive relief Claim against the individual capacity Defendants, with prejudice.

## G. Arment's Motion to Dismiss (Dkt. 64)

### 1. Background

Arment's Motion is brought pursuant to F.R.C.P. 12(b)(5), which provides a Defendant the opportunity to assert that service of process was insufficient. Plaintiffs added

Arment, identified in the case caption as Roger Ardmont, as a new Defendant in their

Second Amended Complaint. Dkt. 50. The Second Amended Complaint, filed on August

14, 2020, alleges that Arment "abused Colby, using excessive force on Colby and

restraining him," and "physically battered Colby Bloom, as more fully described herein."

*Id.*, at ¶ ¶ 187, 281.

F.R.C.P. 4(m), which outlines the time limits for service of process, provides, in

relevant part, that:

> If a defendant is not served within 90 days after the complaint is filed, the
> court—on motion or on its own after notice to the plaintiff—must dismiss the
> action without prejudice against that defendant or order that service be made
> within a specified time. But if the plaintiff shows good cause for the failure,
> the court must extend the time for service for an appropriate period.

F.R.C.P. 4(m). Both parties agree that service was due no later than Thursday, November

12, 2020, and that Arment was actually served on December 16, 2020.

*2. Legal Standard*

In the Ninth Circuit, a motion to dismiss based on a Plaintiff's failure to abide by

F.R.C.P 4(m)

> [r]equires a two-step analysis in deciding whether or not to extend the
> prescribed time period for the service of a complaint. First, upon a showing
> of good cause for the defective service, the court must extend the time period.
> Second, if there is no good cause, the court has the discretion to dismiss
> without prejudice or to extend the time period.

*In re Sheehan*, 253 F.3d 507, 512 (9th Cir. 2001) (internal citations omitted). With respect

to the first step, the Circuit has clarified that showing "good cause" is the equivalent of

demonstrating "excusable neglect," and that, to do so, a Plaintiff may also be required to

show "(a) the party to be served personally received actual notice of the lawsuit; (b) the

defendant would suffer no prejudice; and (c) plaintiff would be severely prejudiced if his complaint were dismissed." *Boudette v. Barnette*, 923 F.2d 754, 756 (9th Cir. 1991) (citing *Hart v. United States*, 817 F.2d 78, 80–81 (9th Cir.1987)).

The Ninth Circuit has declined to "articulate a specific test that a court must apply in exercising its discretion" under the second step of the Rule 4(m) analysis. *In re Sheehan*, 253 F.3d at 513. However, it has noted that if a Plaintiff cannot establish good cause, the Court's discretion to nevertheless extend the prescribed time period for the service of a complaint "is broad." *Id.* Finally, if a court declines to extend the time period for the service of process, it must dismiss the complaint without prejudice. *See U.S. v. 2,164 Watches, More or Less Bearing a Registered Trademark of Guess?, Inc.*, 366 F.3d 767, 772 (9th Cir. 2004).

### 3. Discussion

Plaintiffs have not established there was good cause for their defective service to Arment. In fact, besides a passing allusion to Arment's misspelled name on the Second Amended Complaint, Plaintiffs' briefing on this motion provides no excuse or justification for serving him more than a month late. Moreover, several of the *Boudette* factors, which a court may consider when determining whether a plaintiff has demonstrated good cause, weigh against Plaintiffs here. First, there is no suggestion that Arment received actual notice of this lawsuit prior to his receiving actual service on December 16, 2020.

Moreover, there is reason to think that Arment has suffered some prejudice from the defective service. Arment argues that if service had been timely made, he could have participated in several pending Motions to Dismiss the Second Amended Complaint. Dkt.

64-1, at 3. Plaintiffs counter that this argument is without merit because "Defendants' Opening Briefs were due on October 1, 2020, nearly 6 weeks before the November 11 timeline for service of process." Dkt. 70, at 5. While the Court appreciates Plaintiffs' point here, it does not absolutely preclude the possibility that, had Arment been timely served, he might have had the chance to participate in the Motions to Dismiss. Just because Plaintiffs had until November 12, 2020, to serve Arment does not mean that they were required to wait that long. Indeed, Defendants Tompkins and Berg, who were likewise only added as a Defendants in the Second Amended Complaint, were served on 8/30/2020 and participated in the Motions to Dismiss. While the Court recognizes that there was a window of time in which Arment could have been timely served and still missed the chance to participate in the Motion to Dismiss, it also notes that all of the other similarly situated Defendants were timely served and afforded the opportunity to participate in the Motion to Dismiss. It therefore seems that the defective service was somewhat prejudicial to Arment. As such, Plaintiffs cannot establish good cause for the defective service.

Nonetheless, it appears to the Court that dismissing this matter against Arment because of Plaintiffs' failure to timely serve him could severely prejudice Plaintiffs and the administration of justice. Accordingly, the Court will exercise its "broad discretion" under the second step of the Rule 4(m) analysis. The source of this potentially severe prejudice is the possibility for the statute of limitations for some of the claims against Arment to run if the Court were to grant his Motion. Idaho Code § 5-219(5), for example, provides that an action for assault or battery must be brought within two years of the alleged incident. As Plaintiffs point out, the Second Amended Complaint alleges that Arment abused Colby

Bloom, but it is not clear when.

It would be a major windfall for Arment if the statute of limitations were to run before Plaintiffs could file another complaint and serve him. Considering that the Second Amended Complaint was filed on August 13, 2020, that appears to be a strong possibility. The Ninth Circuit has signaled that the running of the statute of limitations is a consideration supporting the discretionary granting of an extension of the time to make service: "It is conceivable, however, that prejudice might result from a dismissal without prejudice if, for example, the statute of limitations had expired. The existence of prejudice of this kind could affect what action a court might choose to take in response to untimely service of process." *2,164 Watches,* 366 F.3d at 773 (also noting that "[t]he 1993 amendments to General Rule 4(m) gave courts greater leeway to preserve meritorious lawsuits despite untimely service of process."). The Court declines to grant such a windfall.

The Court also agrees with Plaintiffs that this case remains in the early pleadings stage. Arment can still participate in all aspect of this case, from discovery through its final resolution. He will have ample opportunity to defend himself on the merits. As such, the Court DENIES Arment's Motion to Dismiss (Dkt. 64).

The Court will also sua sponte discuss the sufficiency of the allegations against Arment in Plaintiffs' Second Amended Complaint. That is to say, even though Arment has not filed (or joined) the above Motions to Dismiss—nor could he have at the time they were filed—the Court will briefly analyze his status *as if* he had joined the above-discussed motions. The Court takes this approach for two reasons. First, this case is over two years old and formal discovery has yet to commence. Rule 1 mandates that the Court "secure the

just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Taking this matter up now serves that goal. Second, the analysis is straightforward in light of the fact that Arment is mentioned a total of five times in the Second Amended Complaint—and only twice are allegations actually leveled against him.

The entirety of the allegations against Arment are found in Plaintiffs' battery count (Count XI) and in one paragraph of the "General Allegations" section. The battery Count states that "Defendants Edwards and [Arment] physically battered Colby Bloom," (Dkt. 50, at 50) while the other paragraph alleges that Arment "abused Colby, using excessive force on Colby and restraining him." Dkt. 50, at 34. The Court notes that the allegations against Arment are almost identical to the allegations against Defendant Tompkins.[18] As such, the analysis with respect to Arment would have been the same as the analysis for Tompkins, had Arment participated in the Motion to Dismiss. Accordingly, Counts VIII, IX, X, XIII, and XV—generalized claims against "the individual capacity defendants"— are dismissed against Arment, as they were against Tompkins. Then, in accordance with Section IV(D) above, the Court finds (as it did with Tompkins), that the allegations against Arment in relation to the battery claim, while scant, sufficiently put Arment on notice and may proceed at this stage.[19]

---

[18] The allegations against Defendant Tompkins are that he "abused Nick Pease," (Dkt. 50, at 31) and "battered Nickolas Pease, as more fully described herein." Dkt. 50, at 49.

[19] Now, should there be alternative grounds for dismissal, the Court is not foreclosing Arment from filing a motion to dismiss. The Court is simply finding that he is similarly situated to Defendant Tompkins and, therefore, the results are similar as well. Again, the Court leaves to Arment's discretion how to pursue his case.

MEMORANDUM DECISION AND ORDER - 45

## V. ORDER

The Court HEREBY ORDERS:

1.  Defendants' Motions to Dismiss (Dkt. 58, Dkt. 59) are GRANTED in PART and DENIED in PART as outlined above and as summarized below:

    a.  Defendants' Motions to Dismiss Counts IV-VII are DENIED.

    b.  Defendants' Motions to Dismiss Count VIII are GRANTED with respect to Defendants Tompkins, Berg, King, Miller, Luper, and Combs. They are DENIED with respect to Defendants Edwards, Gushwa, and Newton.

    c.  Defendants' Motions to Dismiss Count IX are GRANTED with respect to Defendants Tompkins, Edwards, and Gushwa. They are DENIED with respect to Defendants Berg, King, Miller, Luper, Combs, and Newton.

    d.  Defendants' Motions to Dismiss Count X are GRANTED with respect to Defendants King, Newton, Combs, Luper, Tompkins, and Berg. They are DENIED with respect to Defendants Edwards and Miller.

    e.  Defendants' Motions to Dismiss Count XI with respect to Defendants King, Newton, Combs, Luper, and Berg are GRANTED.

    f.  Defendants' Motions to Dismiss Count XIII are GRANTED with respect to Defendants King, Luper, Combs, Tompkins, and Berg. They are DENIED with respect to Defendants Edwards and Newton.

    g.  Defendants' Motions to Dismiss Count XV against the Individual

Defendants in their individual capacities are GRANTED.[20]

2. Defendant Arment's Motion to Dismiss (Dkt. 64) is DENIED.

DATED: September 2, 2021

David C. Nye
Chief U.S. District Court Judge

---

[20] As explained above, Arment did not file or join any of the Motions to Dismiss. The Court does not know if he would have or if Plaintiffs would have opposed it. The Court assumed, for efficiency, that he would have joined such a motion, and determined which claims against him survive at this stage. Again, however, if either party disagrees with this approach, the Court will entertain a short motion, due within seven (7) days of this order and not to exceed five (5) pages in length, discussing how to proceed with respect to Arment.

MEMORANDUM DECISION AND ORDER - 47